Henry T. McMILLAN et al.,
Plaintiffs-Appellees,

v.

ESCAMBIA COUNTY, FLORIDA et al.,
Defendants-Appellants.

Nos. 78–3507, 80–5011.

United States Court of Appeals,
Fifth Circuit.*

Sept. 24, 1982.

Rehearing and Rehearing En Banc
Denied Nov. 4, 1982.

Paula G. Drummond, Pensacola, Fla., for Escambia County.

Rhyne & Rhyne, Charles S. Rhyne, William S. Rhyne, Washington, D.C., for all defendants-appellants.

Don J. Canton, City Atty., Pensacola, Fla., for City of Pensacola.

Crawford, Blacksher, Figures & Brown, J. U. Blacksher, Larry Menefee, Mobile, Ala., Kent Spriggs, Tallahassee, Fla., Eric Schnapper, New York City, Edward Still, Birmingham, Ala., for plaintiffs-appellees.

Before COLEMAN, PECK ** and KRAVITCH, Circuit Judges.

ON PETITIONS FOR REHEARING

KRAVITCH, Circuit Judge:

Plaintiffs filed this class action in March 1977 challenging the at-large systems for electing Escambia's County Commissioners and School Board members. The case was consolidated with another class action suit challenging the election scheme for the Pensacola City Council. The district court held all three systems unconstitutional, and defendants in each case appealed. We affirmed the district court's decision as to the

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96 452—October 14, 1980.

** Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

School Board and City Council, but reversed its holding as to the County Commission. *McMillan v. Escambia County,* 638 F.2d 1239 (5th Cir. 1981) (appeal on merits); *McMillan v. Escambia County,* 638 F.2d 1249 (5th Cir. 1981) (appeal on remedy); *Jenkins v. Pensacola,* 638 F.2d 1249 (5th Cir. 1981) (appeal on remedy). Plaintiffs sought rehearing of our decision as to the County Commission.[1] We reserved ruling on the petition for rehearing pending the United States Supreme Court's decision in a case raising similar issues. That case has now been decided. *See Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Having reviewed the Supreme Court's opinion in *Lodge,* we conclude that the standards it sets forth compel reversal of our prior decision. We therefore grant plaintiffs-appellees' motion for rehearing, vacate the portion of our original opinion concerning the County Commission, No. 78–3507, 638 F.2d 1239, vacate opinion No. 80–5011, 638 F.2d 1249, and substitute the following.

## I.

### Background

The five members of Escambia County's governing body, the Board of County Commissioners, are elected for staggered four-year terms in accordance with an at-large voting system. Under this system candidates run for numbered places corresponding to the districts in which they live, but each must be elected by the voters of the entire county. There is no majority-vote requirement for the general election, although candidates must obtain a majority of the votes cast in the party primaries to win party nomination.

As of the date of trial, four blacks had run for the County Commission, none of whom had been elected. Plaintiffs, representing black citizens of Escambia County, brought this action claiming that the county's at-large election scheme unconstitutionally[2] dilutes their votes.

The district court found that blacks comprised seventeen percent of the registered

1. Neither the School Board nor the City Council sought rehearing. Instead those defendants, jointly with the plaintiffs, filed motions requesting issuance of the mandates, which we granted. Hence the constitutionality of the election systems for the School Board and City Council is not before us. (The City of Pensacola filed a petition for writ of certiorari to the Supreme Court. That petition, however, was subsequently dismissed on the City's own motion. *See City of Pensacola v. Jenkins,* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981).

2. Plaintiffs sought relief under the first, thirteenth, fourteenth, and fifteenth amendments to the Constitution, the Civil Rights Act of 1957, 42 U.S.C. § 1971(a)(1), the Voting Rights Act of 1965, *as amended in* 1975, 42 U.S.C. § 1973, and the Civil Rights Act of 1871, 42 U.S.C. § 1983. The district court held that the at-large system violated plaintiffs' rights under the fourteenth and fifteenth amendments and the Voting Rights Act of 1965, 42 U.S.C. § 1973, which was enacted to carry out the purpose of the fifteenth amendment. It rejected plaintiffs' § 1971(a)(1) claim because that statute "concerns itself only with entitlement to cast one's vote at elections, and such is not presented in this voting dilution suit." *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 34 (N.D. Fla. July 10, 1978). The court did not address plaintiffs' claims based on the first and thirteenth amendments.

The defendants appealed the district court's holdings under the fourteenth and fifteenth amendments and the Voting Rights Act. Having the benefit of the Supreme Court decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *see* text *infra* at 4–5, we rejected plaintiffs' fifteenth amendment and Voting Rights Act claims in accordance with the *Bolden* plurality's view that vote-dilution claims are cognizable only under the fourteenth amendment. *McMillan v. Escambia County,* 638 F.2d at 1242–43 nn. 8–9. The *Lodge* decision expresses no view on the applicability of the fifteenth amendment and Voting Rights Act to claims of this type, *Rogers v. Lodge,* —— U.S. at —— n. 6, 102 S.Ct. at 3276 n. 6, and hence provides no basis for departing from the *Bolden* plurality's analysis. Congress' recent amendment to Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, encompasses a broader range of impediments to minorities' participation in the political process than those to which the *Bolden* plurality suggested the original provision was limited. Voting Rights Act Amendments of 1982, Pub. L. No. 97–205, § 3, 97th Cong., 2d Sess. (1982) (to be codified at 42 U.S.C. § 1973), *reprinted in* 51 U.S.L.W. 2 (1982); *see* S. Rep. No. 417, 97th Cong., 2d Sess. 2, 16, 28 & 30 n. 120 (1982), U.S. Code Cong. & Admin. News 1982, p. ——. The amendment also eliminates the requirement that plaintiffs demonstrate purposeful discrimination in the enactment or maintenance of the challenged voting system or practice. Voting Rights Act Amendments of 1982, Pub. L. No. 97–205 § 3; S. Rep. No. 417, 97th

voters in Escambia County and that in elections in which black candidates had run for the County Commission there had been a consistent pattern of racially polarized voting. The court found that the at-large system, coupled with the above factors, prevented black candidates from attaining a majority of the votes in the County Commission elections.[3] Having found that the at-large system had such discriminatory effect, the district court considered whether its purpose was discriminatory. Although the court found that the at-large system had not been enacted for a discriminatory purpose,[4] it concluded that the scheme had been maintained for such a purpose. In finding intentional discrimination, the court relied on a variety of factors, including the adverse effects of past discrimination by the state and county governments on blacks' exercise of their suffrage rights and participation in the political system, the unresponsiveness of elected County Commissioners to some needs of black citizens,[5] the depressed socio-economic status of blacks in the county, the tenuousness of the state policy behind the at-large system, and other features of the election system that enhanced its discriminatory effect. In addition to the above circumstantial or *Zimmer* evidence,[6] the district court found that the County Commissioners' refusal to submit to voters a proposed referendum that would change the election system from at-large to

Cong., 2d Sess. 2, 16 & 27–30. Appellees argue in their supplemental brief that we should reverse our prior decision and affirm the district court's holding that they are entitled to relief under the fifteenth amendment and the Voting Rights Act, as amended. While appellees have provided support for the proposition that the amendment was intended to apply to pending litigation, *see* 128 Cong. Rec. H3841 (daily ed. June 23, 1982) (remarks of Rep. Sensenbrenner); *id.* at S7095 (daily ed. June 17, 1982) (remarks of Sen. Kennedy), and have presented a cogent argument that the amended Act entitles them to relief, we decline to address the fifteenth amendment and Voting Rights Act issues for the following reason. As a result of this litigation, elections for the Escambia County Commission have not been held since 1978. Pursuant to a stay of elections entered by this court in 1980, the elections scheduled for that year and for 1982 were cancelled. Because the term of office for Escambia County Commissioner is four years, as of November 1982, none of the acting Commissioners will be serving pursuant to democratic election. Appellees have moved this court to dissolve the stay of elections so that "normal democratic processes" may proceed in Escambia County. Although appellees have briefed the fifteenth amendment and Voting Rights Act issues and discussed the effect of the 1982 amendment on this case, appellants have not yet been afforded opportunity to respond to appellees' argument. Accordingly, we could not render a decision on such issues without taking additional time to allow appellants to respond and possibly to schedule oral argument on these questions of first impression. *See* Rules 23(b), 24(a), Interim Rules of the United States Court of Appeals for the ·Eleventh Circuit, 28 U.S.C.A. (West Supp. 1982). Resolution of these issues could result in further delay and disruption of the electoral process in Escambia County. Moreover, our decision of these issues would not affect the outcome of this case because we hold, *infra,* that appellees are entitled to relief on their fourteenth amendment claim. Hence, we defer resolution of the Voting Rights Act and fifteenth amendment issues until a later day. The text of this opinion will be devoted to discussing the effect of *Lodge* on the fourteenth-amendment standards governing vote-dilution claims and the applicability of such standards to this case. *See McIntosh County Branch of the NAACP v. City of Darien,* 605 F.2d 753, 756 n.1 (5th Cir. 1980).

3. Although there is no majority-vote requirement for the general election, there is such a provision for the primary election. Moreover, the district court found that "as a practical matter, no one has in recent history won a general election without a majority." *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 18 (N.D. Fla. July 10, 1979).

4. The at-large requirements of the general and primary elections for the County Commission are based on a 1901 amendment to the Florida Constitution. Fla. Const., art. 8, § 5. The district court found that the historical background of the amendment suggested racial motivation. Nonetheless, the court declined to find that such system was enacted for a discriminatory purpose because a prior decision of the Fifth Circuit had determined that there was no racial motivation behind the amendment and because the plaintiff's own expert had substantiated this view.

5. Although the court found that the elected commissioners had generally been responsive to the needs of black citizens, it noted a lack of responsiveness in two areas. *See* note 16 *infra.*

6. In *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636,

single-member districts further supported a finding that the at-large system was being maintained for a discriminatory purpose.

The district court decided this case prior to the Supreme Court's decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The district judge, however, apparently anticipated the holding of *Bolden* that discriminatory purpose is a required element of a vote-dilution claim under the fourteenth amendment.[7] He therefore rendered findings on the issue of discriminatory purpose, which we found sufficiently explicit to preclude the necessity for a remand in light of *Bolden.* Instead of remanding the case for further findings, we reviewed the district court's findings to determine whether they reflected enough evidence of discriminatory purpose to meet the standard set forth in *Bolden.* Concluding that the district court's subsidiary findings were not adequate to support its ultimate finding of intent under the *Bolden* standard, we reversed the decision of the district court.

In *Bolden,* the Supreme Court reversed a decision of the former Fifth Circuit that had invalidated an at-large election system as unconstitutionally diluting blacks' voting power. The *Bolden* Court explicitly held that discriminatory purpose was a required element of a vote-dilution claim brought under the fourteenth amendment[8] and reversed the lower court decision on the ground that there was inadequate evidence that the election system had been enacted or maintained for a discriminatory purpose. No view by any of the Justices in *Bolden* commanded a majority. Hence in interpreting that decision to determine its effect on this case, we looked to the opinions of the plurality and concurring Justices and attempted to discern "the view with which a majority of the Court could agree." *McMillan v. Escambia County,* 638 F.2d at 1243.

At least five Justices agreed in *Bolden* that "discriminatory purpose of some sort must be proven" in vote-dilution cases. *Id.* Those Justices split on the standard of proof for intent, however.[9] In view of the divergence between the Justices, we adopted Justice Stewart's opinion, which commanded the greatest number of votes. *See id.* Accordingly, we followed the plurality's

---

96 S.Ct. 1083, 47 L.Ed.2d 296 (1975) (per curiam), the former Fifth Circuit set forth a list of factors relevant to the determination whether multimember or at-large districting schemes are "rooted in racial discrimination." *Id.* at 1305. The factors mentioned by the court were:

lack of access [by the minority] to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, [ ] that the existence of past discrimination in general precludes the effective participation in the election system, . . . the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts.

*Id.*

**7.** At the time the district court was considering this case, the Supreme Court had decided two cases that foreshadowed the holding in *Bolden* that discriminatory intent is a required element of an equal protection based vote-dilution claim. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Court held that a showing of disproportionate impact was not alone sufficient to support a claim of discrimination in employment under the fifth amendment. Instead, it held that discriminatory purpose is a required element of equal protection claims. In *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) the Court applied the discriminatory intent requirement to a fourteenth amendment claim of racially discriminatory zoning. Language in both opinions suggested the intent requirement is applicable to other types of equal protection claims. *See Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. at 265, 97 S.Ct. at 563; *Washington v. Davis,* 426 U.S. at 239–41, 244–45, 96 S.Ct. at 2047–48, 2049–50. The district court relied on *Arlington Heights* and on the former Fifth Circuit decision in *Nevett v. Sides,* 571 F.2d 209 (1978), in holding that the plaintiffs were required to show discriminatory purpose as well as discriminatory impact. *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 22–23 (N.D. Fla. July 10, 1978).

**8.** *See* note 7 *supra.*

**9.** *Compare Mobile v. Bolden,* 446 U.S. at 71–74, 100 S.Ct. at 1502–1503 (plurality opinion) *with id.* at 90–92, 100 S.Ct. at 1512–13 (Stevens, J. concurring in result). *See also id.* at 80, 100 S.Ct. at 1507 (Blackmun, J., concurring in re-

directive that the *Zimmer* factors, which the Fifth Circuit had previously established as indicia of unconstitutional vote-dilution, *see* note 6 *supra,* are insufficient, standing alone, to support a finding of discriminatory purpose. *See Mobile v. Bolden,* 446 U.S. at 73, 100 S.Ct. at 1503 (plurality opinion).[10]

As noted above, the district court based its finding of intent mainly on *Zimmer* factors although it also considered the County Commissioners' refusal to submit to the electorate a proposal to change the election system to a single-member district scheme. We interpreted *Bolden* as holding that the *Zimmer* criteria could not adequately support a finding of intentional discrimination and therefore focused on the latter evidence cited by the district court in reviewing its finding of intent. After examining the record, we concluded the Commissioners' actions in rejecting the proposed referendum provided insufficient evidence of intent to discriminate against blacks. We noted that the district court was entitled to discredit the Commissioners' testimony that there was no racial motivation behind their action but held that "disbelief of that testimony is not sufficient to support a contrary finding." *McMillan v. Escambia County,* 638 F.2d at 1245. Because the only other evidence of intent consisted of *Zimmer* factors, we reversed the district court's finding that the county election scheme was being maintained for a discriminatory purpose.

## II.

*Effect of* Rogers v. Lodge *on Our Decision That Plaintiffs Failed to Establish Unconstitutionality of Escambia County Commission Election System*

As we noted in our prior opinion, the *Bolden* Court's divergent analyses on the

intentional discrimination issue left us somewhat "adrift on uncharted seas with respect to how to proceed." *Id.* at 1242 (quoting *Mobile v. Bolden,* 446 U.S. at 103, 100 S.Ct. at 1518 (White, J., dissenting)). In the more recent decision of *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the Supreme Court substantially clarified the constitutional standard governing vote-dilution claims. The *Lodge* opinion, which garnered a majority of the Justices,[11] reaffirmed the holding of *Bolden* that evidence of purposeful discrimination is required to sustain an equal protection challenge to an election system. *Id.* at ——, 102 S.Ct. at 3275. The majority's analysis of the standard governing the type and amount of evidence necessary to show discriminatory intent, however, reflects both a more favorable view of the *Zimmer* factors and a greater deference to the finding of the district court than the analysis of the *Bolden* plurality.

Although the district court in *Lodge* had relied primarily on the *Zimmer* factors in finding purposeful discrimination, the Supreme Court rejected the argument that the decision was infirm under *Bolden.* Rather, the Court held that the district court had applied the proper legal standard. It noted that the district court's decision had been "rendered a considerable time after *Washington v. Davis* and *Arlington Heights*" and that "the trial judge also had the benefit of *Nevett v. Sides,*" 571 F.2d 209 (5th Cir. 1978), which applied the discriminatory intent standard of the above cases to a vote-dilution claim (*see* note 6 *supra*). *Rogers v. Lodge,* —— U.S. at

sult); *id.* at 101–03, 100 S.Ct. at 1517–18 (White, J., dissenting).

**10.** The plurality interpreted *Zimmer* as setting forth criteria relevant only to discriminatory *impact* and as holding that such impact was alone sufficient to establish an unconstitutional election system. *See Mobile v. Bolden,* 446 U.S. at 71, 100 S.Ct. at 1502 (plurality opinion). Justice White, who was of the view that sufficient evidence of discriminatory intent was present in *Bolden,* pointed out that the factors

articulated in *Zimmer* were derived from prior Supreme Court vote-dilution cases and had been considered as circumstantial evidence of discriminatory purpose. *Id.* at 101, 100 S.Ct. at 1517 (White, J., dissenting).

**11.** The *Lodge* majority comprised the three Justices who dissented in *Bolden* (Justices White, Brennan, and Marshall), Justice O'Connor, who joined the Court after *Bolden* was decided, and Chief Justice Burger, who voted with the plurality in *Bolden.*

——, 102 S.Ct. at 3276. Moreover, the district court had explicitly recognized the discriminatory intent requirement and had been aware that *Zimmer* factors were not exclusive or absolute but simply "were relevant to the question of discriminatory intent." *Id.* The Court also declined to "disturb the District Court's finding that the at-large system in Burke County was being maintained for the invidious purpose of diluting the voting strength of the black population." *Id.* at ——, 102 S.Ct. at 3278. The Court's opinion requires appellate courts to defer to district courts' factual findings on intent because such findings "represent [ ] ... a blend of history and an intensely local appraisal of the design and impact of the [election system at issue] in light of past and present reality, political and otherwise." *Id.* at —— – ——, 102 S.Ct. at 3278 (quoting *White v. Regester*, 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973)). The Court thus applied the clearly erroneous standard of Fed. R. Civ. P. 52 to the district court's finding of discriminatory intent. *Id.* (citing *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (applying Rule 52 to finding of intent in employment discrimination suit)).

### A. Did Court Below Apply Correct Constitutional Standard?

■ Applying the analysis adopted by the *Lodge* majority to this case, we consider first whether the district court applied the proper fourteenth amendment standard to appellee's vote-dilution claim. As we noted in our original opinion, *McMillan v. Escambia County*, 638 F.2d at 1243, "the district court below correctly anticipated that the *Arlington Heights* requirement of purposeful discrimination must be met." Indeed, the district court expressly recognized that

> [a]n at-large election system which operates to dilute the vote of black citizens is not necessarily violative of the Constitution. It must also be shown that discriminatory intent was a motivating factor in the enactment of the system or is a motivation in the present maintenance of the system.

*McMillan v. Escambia County*, PCA No. 77–0432, slip op. at 22–23 (N.D. Fla. July 10, 1978). As in *Lodge*, the district court in this case had the benefit of *Nevett v. Sides*, *supra*. The court below relied on *Nevett* in holding that "[i]nvidious purposes in the maintenance of the system are proved by the circumstances surrounding the operation of the system and may be inferred from findings under the *Zimmer* factors." *McMillan v. Escambia County*, PCA No. 77–0432, slip op. at 23 (N.D. Fla. July 10, 1978) (citing *Nevett v. Sides*, 571 F.2d at 222). The district court's consideration of the Commissioners' response to the single-member district proposal of the charter committees indicates that the court did not view the *Zimmer* factors as the exclusive criteria for determining discriminatory purpose. Rather, the court inferred from the Commissioners' action, together with the aggregate of the findings under the *Zimmer* factors, that the at-large system was being maintained for invidious purposes. *See McMillan v. Escambia County*, PCA No. 77–0432, slip op. at 19, 21 & n. 6, 29–31 (N.D. Fla. July 10, 1978). *Compare id. with Rogers v. Lodge*, —— U.S. at ——, 102 S.Ct. at 3276, 3279–80. The district court's heavy reliance on *Zimmer* criteria as circumstantial evidence of intent to discriminate, while at odds with our interpretation of the standard for proving intent under *Bolden*, see text *supra* at 4–5, is fully consistent with the analysis adopted by a majority of the Supreme Court in *Lodge*. Hence, we conclude the court below applied the correct legal standard to this case.

### B. Was District Court's Finding of Intentional Discrimination Clearly Erroneous?

■ In light of the *Lodge* Court's reaffirmation of the validity of the *Zimmer* criteria as circumstantial evidence of intent, we now conclude that the district court's finding of intent in this case—though based largely on the *Zimmer* factors—was not clearly erroneous.

The district court found that blacks constitute twenty percent of the population

and seventeen percent of the registered voters of Escambia County. Although black citizens had run for County Commission on four occasions, no black candidate had ever won an election. None of the blacks who ran was able to obtain the majority of votes necessary to win the Democratic primary. The court found that in each of the races in which a black candidate ran for County Commission, the voting had been severely polarized along racial lines.[12] In other words, "whenever a black challenges a white for countywide office, a consistent majority of the whites who vote will consistently vote for the black's opponent.[13] The court found that the numerical minority of blacks coupled with the white bloc vote prevented blacks from attaining a majority of votes in the county. Although the

12. The R$^2$ coefficient, which reflects the percentage of variation in the vote attributable to the race of the registered voters in the races in which black candidates ran, ranged from .85 to .98. *McMillan v. Escambia County*, PCA No. 77 0432, Appendix A (N.D. Fla. July 10, 1978). The district court's findings concerning racially polarized voting in Escambia County elections are set forth in full in our original opinion. *McMillan v. Escambia County*, 638 F.2d at 1241 42 n. 6.

13. The district court noted that in the one countywide election in which a black candidate ran unopposed in the Democratic primary, that candidate lost the general election to a white Republican candidate. That election, which was a race for a position on the County School Board, was the first "in the modern history of Escambia County [in which] a Republican had won any countywide office." *McMillan v. Escambia County*, PCA No. 77–0432, slip op. at 11 (N.D. Fla. July 10, 1978). Moreover, the Republican candidate received 22,523 votes despite a total Republican registration in the County of only 7,268; whereas in a prior election in which the same Republican had run against a white Democrat, he had received only 10,721 votes.

14. As the Court stated:
Voting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race. Because it is sensible to expect that at least some blacks would have been elected in Burke County, the fact that none have ever been elected is important evidence of purposeful exclusion. *Rogers v. Lodge*, ·· — U.S. at ——, 102 S.Ct. at 3279.

Supreme Court has consistently maintained that racially polarized voting and inability of a minority group to obtain legislative seats in proportion to its voting potential are not alone sufficient to prove that a multimember or at-large districting scheme is being used invidiously to minimize the voting strength of the minority group, e.g., *Rogers v. Lodge*, —— U.S. at ——, 102 S.Ct. at 3279; *White v. Regester*, 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 149–50, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971), it has recognized that such facts "bear heavily on the issue of purposeful discrimination." *Rogers v. Lodge*, —— U.S. at ——, 102 S.Ct. at 3279.[14]

Appellants argue that the facts in this case distinguish it from *Lodge* because blacks comprise only 23% of the population and 17% of the registered voters in Escambia County, whereas they made up a majority of the population and 38% of the registered voters in Burke County. Appellants contend that the Supreme Court's assessment in *Lodge* that some blacks likely would have been elected in Burke County had the voting not occurred along racial lines does not hold true in Escambia County, where blacks constitute only a minority of the county's voting population. Appellants misunderstand the question at issue, however. The Supreme Court's premise is that "without bloc voting the minority candidates would not lose elections solely because of their race." *Id.* Not accounting for other variables, elections would be expected to produce a ratio of successful black and white candidates corresponding roughly to the respective percentages of the population comprised by each race. Under this analysis, blacks should have attained office in roughly 40% of the elections in Burke County, whereas in Escambia County the projection would be closer to 20%. Of course, this analysis omits many factors other than race that could result in a lower proportion of successful black candidates. Certainly some degree of deviation from proportionality to population would neither be unusual nor indicative of intentional discrimination in the election system. Here, as in *Lodge* however, the deviation is substantial; no black has ever served as Commissioner in Escambia County. Although the number of blacks that reasonably could be expected to hold office in Escambia County elections is smaller than that in Burke County, it is as sensible in this case as it was in *Lodge* to expect that "at least some blacks would have been elected" absent racially polarized voting.

As in *Lodge,* the district court below also considered the impact of past discrimination on the ability of blacks to participate in the political process. It found that the County Commission and School Board election systems "had their genesis in the midst of a concerted state effort to institutionalize white supremacy." *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 4 (N.D. Fla. July 10, 1978). Prior to 1901, County Commissioners were appointed by the governor, and the court found that "appointment was favored over election to ensure against the possibility that blacks might be elected in majority black counties." *Id.* In 1889, Florida instituted a poll tax to disenfranchise blacks. The court found that although the tax was of limited success, "enough blacks were disenfranchised to permit the state to allow at-large election of county commissioners." *Id.* at 5. The court found that enactment of Jim Crow laws and exclusion of blacks from the Democratic Party, beginning in 1900, further impeded black participation in the electoral process. In 1907, Florida enacted a law providing for primary elections of County Commissioners in which candidates were elected from single-member districts. 1907 Fla. Laws, ch. 5697, § 1. The district court found that the anomaly between the white, districted primary elections and the at-large general elections uniquely disadvantaged blacks: "Since blacks could not vote in the Democratic Primary district elections, they were forced to challenge white Democratic nominees in at-large elections in which blacks had no voter majorities. In effect, the white primary was the election." *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 5 (N.D. Fla. July 10, 1978). The Florida Supreme Court invalidated this dual system in 1945, and at-large voting was instituted in the primaries several years later.

The district court found that there are no longer any slating organizations that prevent blacks from participating in the election of County Commissioners nor direct impediments to blacks' registration and voting. The court found "no significant difference" currently existing between black and white voter registration. *Id.* at 6. Nonetheless, it concluded that "other barriers ... effectively operate to preclude access for blacks." The court cited the consistent inability of blacks to win elections and a $1000 filing fee required of candidates for County Commission as factors that had discouraged blacks from running, with the result that the number of blacks seeking countywide office in recent years was "far lower than one would expect based on their percentage of the population." *Id.* at 10. Indeed, the court found that because of these impediments no blacks had run for County Commission since 1970. *Id.*

As additional evidence of exclusion of blacks from the political process, the district court noted that state-enforced segregation has created two separate societies in Escambia County. Churches, clubs, neighborhoods, and until recently, schools in the county have remained segregated by race. The court found that this "continued separation [of blacks] from the dominant white society" not only has "left blacks in an inferior social and economic position, with generally inferior education," but has also "helped reduce black voting strength and participation in government." *Id.* at 17. Specifically, the court found that the segregation of black and white citizens had helped create bloc voting and resulted in white candidates' failure to arouse interest among blacks [15] and in city and county gov-

---

Finally, we emphasize our understanding of the limited role of evidence of racially polarized voting and lack of success by minority candidates. Such facts are reflective of the dilutive effect of an election system and, circumstantially, of intent to cause that effect. They are "insufficient in themselves to prove purposeful discrimination," however, "absent other evidence such as proof that blacks have less opportunity to participate in the political

processes and to elect candidates of their choice." *Id.*

**15.** The court found that black voters have shown a consistent, nearly unanimous preference for black candidates in races in which blacks have run. *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 13, 20–22 (N.D. Fla. July 10, 1978). Although white candidates actively seek the votes of blacks, studies of

erning bodies' failure to appoint blacks to governmental advisory committees and boards.[16]

The district court found the policy behind the at-large system for electing County Commissioners tenuous. It noted that although the at-large system had been in effect for the general election since 1901, during most of that period a single-district system was employed in the Democratic primaries, which were then tantamount to election.[17] Hence despite the state constitutional requirement of at-large elections, the effect of this dual election system was "to ensure that commissioners were elected from single-member districts." Id. at 24.[18] Several County Commissioners explained the policy behind maintaining the at-large system as rooted in the belief that such system made each Commissioner responsive to the needs of the whole community rather than to a particular district. The district court found this explanation inconsistent with the present operation of the Commission, however. In particular, the court noted that "the residence district of each commissioner is more or less regarded as the district of that commissioner for which he has responsibility and for whose needs he is

voter turnouts indicated that when whites run against whites black voter turnout is significantly lower than when black candidates run for office. Id. at 13 & n. 4, 15. These facts indicate that "blacks view the choice of white candidates as irrelevant to their interests." Id. at 15.

16. Although the court found that the commissioners had generally been responsive to the interests of black citizens, it noted two areas in which they had not. It found that "[t]he commissioners have failed to appoint any more than a token number of blacks to its committees and boards. The black population representing 20% of the county is thus served by an all-white board of commissioners which depends on virtually (95%) all-white advisory panels." McMillan v. Escambia County, PCA No. 77-0432, slip op. at 15 (N.D. Fla. July 10, 1978). The court found the "severe underrepresent[ation]" of blacks on county committees "has independent significance because of the absence or near absence of blacks in elected positions. With such a paucity of black elected and appointed representatives, blacks are excluded from all positions of responsibility in the governmental policymaking machinery." Id. at 21. The court noted the former city mayor's explanation of this failure as resulting from the relative nonvisibility to him of black citizens as compared with whites. A former city council member had referred to the black and white communities as the "black and white 'sides of the fence.'" Id. at 17.

Appellants argue that this case is distinguishable from Lodge because the district court in Lodge found extensive evidence of unresponsiveness by elected officials to the needs of blacks whereas here the court found, with the above-noted exceptions, that the Escambia County Commissioners had generally been responsive to the needs of black citizens. Compare Rogers v. Lodge, —— U.S. at ——, 102 S.Ct. at 3279, with McMillan v. Escambia County, PCA No. 77-0432, slip op. at 15 (N.D. Fla. July 10, 1978). Moreover, appellants argue that the district court's finding that white candidates in Escambia County actively seek the votes of black citizens precludes a finding of discriminatory intent. We addressed these arguments in our original opinion, McMillan v. Escambia County, 638 F.2d at 1248-49, and concluded that once discriminatory intent has been shown responsiveness is irrelevant. The Fifth Circuit panel in the Lodge case subsequently reached the opposite conclusion, holding that proof of unresponsiveness is an essential element of a fourteenth amendment vote-dilution claim. Lodge v. Buxton, 639 F.2d 1358, 1374-75 (5th Cir. 1981). The Supreme Court resolved the issue in its opinion in Lodge. It held that unresponsiveness, while an important factor to be considered in determining whether discriminatory purpose may be inferred, is not essential to prove such purpose. Rogers v. Lodge, —— U.S. at —— n. 9, 102 S.Ct. at 3280 n. 9. In view of the Supreme Court's holding, we do not consider the district court's finding that Escambia County Commissioners were responsive to black citizens' needs in most areas conclusive on the question of discriminatory intent.

17. The Florida Supreme Court invalidated the white primary in 1945. Davis v. State ex rel. Cromwell, 156 Fla. 181, 23 So.2d 85 (1945). County commissioners continued to be nominated through single-member district primaries until 1954, when the Florida court held that the anomaly between the single-member district primaries and the at-large general election violated the state constitution. Ervin v. Richardson, 70 So.2d 585 (Fla. 1954).

18. The court found evidence indicating racial motivation behind the 1901 amendment establishing the present at-large system, but declined to depart from the finding in a prior case that the amendment was not enacted for discriminatory purposes. See McGill v. Gadsden County, 535 F.2d 277 (5th Cir. 1976).

the particular advocate on the commission." *Id.* at 30.[19]

Finally, the district court considered the so-called "enhancing factors" that the courts have recognized as increasing the tendency of a multimember or at-large election system to dilute blacks' voting strength. *See Rogers v. Lodge,* —— U.S. at ——, 102 S.Ct. 3281; *Zimmer v. McKeithen,* 485 F.2d at 1305. The lower court found that the large population and geographical size of the county, the majority-vote requirement for the primary election, and the requirement that candidates run for numbered places [20] enhanced "the problems faced by blacks seeking access to the political processes." *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 18, 19 (N.D. Fla. July 10, 1978).

On the basis of the above findings, the district court concluded:

> To this court the reasonable inference to be drawn from [the Commissioners'] actions in retaining at-large districts is that they were motivated, at least in part, by the possibility single district elections might result in one or more of them being displaced in subsequent elections by blacks.
>
> This conclusion is bolstered by the findings under the *Zimmer* factors that black voting preferences for blacks cannot be

registered in the present system and black candidates are otherwise denied access to that system.

*Id.* at 31. The evidence in the record fully supports the district court's subsidiary findings. The court relied on the aggregate of these findings involving *Zimmer* factors and other evidence in determining that the at-large system in Escambia County is being maintained for discriminatory purposes. Applying the standard enunciated by the Supreme Court in *Lodge,* we cannot say the district court's finding of intent was clearly erroneous.

### III.

### Validity of Remedy Prescribed by District Court

Having invalidated the election system for the Escambia County Commission, the district judge ordered the parties to submit proposals for a remedy to rectify the constitutional defect. The defendant-County Commissioners submitted a plan, which they had adopted by ordinance, providing for a mixed single-member district and at-large scheme.[21] A proposal for a new charter government under which Commissioners would be elected by a system similar to that proposed by defendant-Commissioners [22] was then pending submission to the voters

---

**19.** Appellants asserted in the trial court that the Commissioners' rejection of the single-member district proposal reflected a desire to maintain their own incumbency. We stated in our original opinion that a motive to exclude all other potential candidates could not, absent other evidence, be equated with a desire to exclude blacks in particular. *See McMillan v. Escambia County,* 638 F.2d at 1245. Of course, neither can incumbent legislators' desire to remain in office justify or legitimate an election scheme that is purposefully discriminatory. *Cf. Rogers v. Lodge,* —— U.S. at ——, 102 S.Ct. at 3287 (Stevens, J., concurring) (features of election system that dilute minority voting power are invalid if only purpose they serve is to perpetuate power of entrenched majority). In reversing our prior decision and affirming the district court's finding of intent we do not depart from our prior conclusion that desire to maintain incumbency does not equal racially discriminatory intent. Our affirmance simply reflects consideration of a broader range of evidence than we previously understood could

be used to support a finding of discriminatory purpose. *See* text *supra* at 963–965.

**20.** The court found that this requirement had the effect "that blacks are always pitted in head-on-head races with white candidates, and that the black community cannot concentrate its votes in a large field of candidates." *McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 18 (N.D. Fla. July 10, 1978).

**21.** Defendants' proposal would establish a seven-member Board of County Commissioners with five Commissioners to be elected from single-member districts and two to be elected by the voters of the county at large.

**22.** The difference between the Commissioners' proposal and the ballot proposition was that the former included an apportionment plan whereas the latter entrusted the establishment of district boundaries to a reapportionment commission.

of Escambia County in a referendum election. Defendants requested that the district court adopt this mixed system as the remedial plan of the court.

The Supreme Court cases addressing remedies for unconstitutional vote dilution have distinguished between judicially imposed and legislatively adopted plans. The Court has generally disapproved of multimember district and at-large election schemes as components of a judicially fashioned remedy and has admonished district courts to employ single-member districts. *Connor v. Finch,* 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977); *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 639, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296 (1976); *Connor v. Johnson,* 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). *See also Rogers v. Lodge,* —— U.S. ——, ——, 102 S.Ct. 3272, 3281, 73 L.Ed.2d 1012 (1982). In *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), however, the Court suggested that greater deference will be accorded to legislatively adopted reapportionment plans than to remedies devised by district courts. Legislative plans thus are not limited to the strict single-member district requirement that applies to judicial reapportionment. *Id.* at 540–41, 98 S.Ct. at 2497–98. *See Chapman v. Meier,* 420 U.S. 1, 18, 27, 95 S.Ct. 751, 761, 766, 42 L.Ed.2d 766 (1975).

Because the election scheme proposed by defendants was not a pure single-member district system, the district court addressed whether the proposal should be treated as a legislatively adopted or judicially imposed plan. The court found that the voters of Escambia County were authorized under the Florida Constitution to reapportion the county by referendum. Hence, it concluded that if the voters adopted the proposed new charter, the court should treat the reapportionment scheme as a legislatively adopted plan. The court held, however, that the Commission was without authority under state law to enact such a system, and that in the event the referendum was not passed by the voters of the county the Commission's ordinance adopting essentially the same apportionment system could not be treated as a legislatively adopted plan.

On November 6, 1979, the voters of Escambia County rejected the proposed charter government. Having determined that only the voters, and not the Commission, could enact a reapportionment scheme, the district court concluded that a judicially imposed plan was required. It held that

[u]nder the authorities before the court, a judicially devised plan must require total use of single member districts unless persuasive justification to the contrary exists. No such persuasive justification is here established. Because of that, the plan heretofore submitted by the county commission of Escambia County must be disapproved by this court.

*McMillan v. Escambia County,* PCA No. 77–0432, slip op. at 3 (N.D. Fla. Sept. 24, 1979). The court adopted a plan reapportioning Escambia County into five single-member districts and providing for elections of all members of the County Commission in 1980.[23]

---

**23.** The plan adopted by the district court preserves the staggered terms feature of the current Commission by providing for three of the new Commissioners to serve four-year terms and two of the new Commissioners to serve two-year terms. Thereafter all Commissioners would be elected for four-year terms. The defendants objected to holding elections for all five Commission positions at once and requested that the single-member plan be "phased-in" by permitting two of the Commissioners then serving to remain in office until 1982—the expiration period for their terms. Defendants argued that such procedure would minimize the disruption resulting from turnover on the Commission and allow the two Commissioners whose terms were unexpired to serve the full period to which they were entitled to be in office. The district court rejected this proposal on the ground that "where a governing authority is found to be holding office by virtue of an election scheme which is constitutionally infirm, a court, under its equitable authority, should take steps to correct such defects at the earliest possible date." Moreover, the court found that leaving two at-large Commissioners in office would temporarily give some citizens greater representation than others. We need not decide whether the district court abused its discretion in rejecting defendants' proposed

Defendants appealed from the district court's decision on the remedy. They argued that the Commission was not prohibited by state law from enacting a reapportionment scheme and that the Commission's proposal should be treated as a legislatively adopted plan irrespective of the voters' rejection of the measure in the referendum election. We initially reversed the district court's relief order because we had reversed its decision on the merits concerning the constitutionality of the Escambia County election system. *McMillan v. Escambia County,* 638 F.2d 1249 (5th Cir. 1981). Because we have reversed our own prior decision on the merits, we must now address the validity of the relief ordered by the district court. We agree with the district court's analysis of the remedy issue and accordingly affirm.

The district court based its determination that the Commission was unauthorized to enact a reapportionment scheme on the Florida Constitution. Article VIII, section 1 of the Florida Constitution provides for two types of county governments: (1) government established by charter, which may be adopted or amended "only upon vote of the electors of the county in a special election called for that purpose," Fla. Const. art. VIII, § 1(c); or (2) noncharter government consisting of a five-member board of commissioners elected at-large, *id.* § 1(e). The legislative powers of noncharter governments are expressly limited to those "provided by general or special law," *id.* § 1(f), whereas charter governments "have all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors," *id.* § 1(g). The Escambia County Commission is a noncharter government, and thus its legislative powers encompass only those specifically provided by state law. Defendants cite no state law empowering the Commission to reapportion itself, but contend that, under the analysis of *Wise v. Lipscomb, supra,* the Commission is

implicitly vested with power to reapportion when the existing apportionment scheme has been held unconstitutional. We reject this argument because we are of the view that the district court correctly distinguished this case from *Wise.*

In *Wise* the Dallas City Council adopted a reapportionment scheme with a combination of single-member and at-large districts in response to a declaratory judgment by a federal district court holding the existing at-large scheme unconstitutional. *Wise v. Lipscomb,* 437 U.S. at 538, 98 S.Ct. at 2496. The at-large system had been established by city charter, which under Texas law could be amended only by referendum. *Id.* at 544, 98 S.Ct. at 2499. Despite the absence of an express grant of legislative power to the City Council to change the election system, the Supreme Court upheld the system as a valid legislatively enacted plan. *Id.* at 539–46, 98 S.Ct. at 2496–2500 (White and Stewart, JJ.); *id.* at 547–49, 98 S.Ct. at 2500–01 (Powell, Blackmun, and Rehnquist, JJ. and Burger, C.J., concurring in part and concurring in the judgment). Although six members of the Court agreed that the plan was legislatively rather than judicially imposed, the Justices did not agree on the analysis leading to that conclusion. The opinion of Justice White, concurred in by Justice Stewart, indicates that only those election schemes adopted by a governing body pursuant to its valid legislative powers will be treated as legislative plans. *Id.* at 544–46, 98 S.Ct. at 2499–500. Justices White and Stewart stated that the Dallas City Council plan met this requirement because "[a]lthough the Council itself had no power to change the at-large system as long as the Charter provision remained intact, once the Charter provision was declared unconstitutional, and, in effect, null and void, the Council was free to exercise its legislative powers which it did by enacting the [combined at-large and single-member district] plan." *Id.* at 544, 98 S.Ct. at 2499.

"phased-in" version of the court's remedial plan. The passage of time since the district court rendered its decision has essentially eliminated the objections defendants raised; none

of the Commissioners currently in office will be serving pursuant to his elected term by the time elections under the court's apportionment scheme are held.

972

The opinion specifically notes, however, that "[t]he record suggests no statutory, state constitutional, or judicial prohibition upon the authority of the City Council to enact a municipal election plan under circumstances such as this and respondents have been unable to cite any support for its [sic] contention that the City Council exceeded its authority." *Id.* n. 8, 98 S.Ct. 2499 n. 8. Justices Powell, Blackmun, and Rehnquist and Chief Justice Burger declined to adopt the legislative powers analysis articulated by Justice White. Instead they viewed the "essential point" in distinguishing legislatively from judicially imposed plans "that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court." *Id.* at 548, 98 S.Ct. at 2501 (Powell, Blackmun, and Rehnquist, JJ. and Burger, C.J., concurring in part and concurring in the judgment). In the view of these Justices, the "rule of deference to local legislative judgments remains in force even if, . . . our examination of state law suggests that the local body lacks authority to reapportion itself." *Id.* Justice Marshall, joined by Justices Brennan and Stevens, dissented. These Justices agreed with Justices White and Stewart that only election systems adopted by a governmental body pursuant to its valid legislative authority should be treated as legislative plans. *Id.* at 550, 98 S.Ct. at 2502 (Marshall, Brennan, and Stevens, JJ., dissenting). The dissenting Justices were of the view, however, that the Dallas plan "was not devised by the City Council in the usual course of its legislative responsibil-

ities" but was "proposed as less a matter of legislative judgment than as a response by a party litigant to the court's invitation to aid in devising a plan." *Id.* at 552, 98 S.Ct. at 2503.

■ Because the analysis of Justices White and Stewart effectively controlled the outcome of the *Wise* case,[24] we adopt it as the governing standard for determining when an election system proposed in response to a finding of vote-dilution should be treated as a legislatively rather than judicially imposed plan.[25] Applying that analysis to this case, we conclude that the plan proposed by defendant-Escambia County Commissioners does not meet the requirements for a legislatively adopted plan. The facts here are similar to those in *Wise* in that the only method authorized by state law for adopting a county election system that is not at-large is for the voters of the county to approve such a system by referendum. *See* text *supra* at 17. Unlike the Texas Constitution, however, the Florida Constitution expressly limits the legislative powers of the County Commission to those specifically authorized by state law. Hence, as the district court found, the Commission does not possess the legislative authority to reapportion itself even where the existing apportionment scheme has been held unconstitutional. On this ground, the district court correctly held that a judicially devised plan was necessary.

■ Finally, we hold that the remedial plan adopted by the district court was fully within its discretion. *See East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 638–40, 96 S.Ct. 1083, 1084–85, 47 L.Ed.2d

24. Justices White and Stewart adopted a standard for legislative plans that was more stringent than that stated by the other four concurring Justices, but less stringent than that articulated by the three dissenting Justices.

25. In *Marshall v. Edwards,* 582 F.2d 927, 932–33 (5th Cir. 1978), Judge Wisdom extracted the major points from each of the three relevant opinions in *Wise* and considered all of them in deciding whether the plan at issue was court-ordered or legislative in nature. As we noted in a later case, the facts in *Marshall* indicated a court-ordered plan under any of the Justices'

analyses. *Jenkins v. City of Pensacola,* 638 F.2d 1249, 1252 (5th Cir. 1981). In *Jenkins* we found that the considerations in the opinions of Justices White and Powell pointed in both directions, but concluded that "[o]n balance" the plan was "better viewed as a legislative plan." *Id.* In this case, however, we are presented with a fact situation that under Justice White's analysis points to a court-imposed plan, but under Justice Powell's analysis would be considered a legislative plan. Hence we are forced to decide which of the two approaches we should follow.

296 (1976). *Cf. Chapman v. Meier,* 420 U.S. 1, 26–27, 95 S.Ct. 751, 765–66, 42 L.Ed.2d 766 (1975) (court-ordered plans held to higher standards than legislatively adopted plans); *Corder v. Kirksey,* 585 F.2d 708, 713–15 (5th Cir. 1978) (mixed scheme composed of both single-member districts and at-large seats required justification).

## IV.

For the reasons stated above, we AFFIRM the district court's holding that the election system for the Escambia County Commission violates the fourteenth amendment. We also AFFIRM the remedial plan adopted by the court. In view of the passage of time since the district court issued its remedial order, we REMAND this case to the court below with instructions to revise the scheduling terms of its remedial order accordingly.