**Leila G. BROWN, et al.,**
**Plaintiffs-Appellees,**

**United States of America,**
**Plaintiff-Intervenor,**

**v.**

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ALABAMA, et al., Defendants-Appellants.**

**Leila G. BROWN, et al.,**
**Plaintiffs-Appellants,**

**v.**

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ALABAMA, et al., Defendants-Appellees.**

**Nos. 82–7130, 82–7236.**

United States Court of Appeals, Eleventh Circuit.

June 6, 1983.

Robert C. Campbell, III, James C. Wood, Mobile, Ala., for Board of School Com'rs of Mobile County, Ala., et al.

Thomas H. Figures, Asst. U.S. Atty., Mobile, Ala., Paul F. Hancock, Irving Gornstein, Civil Rights Division, Dept. of Justice, Washington, D.C., for U.S.

Blacksher, Menefee & Stein, Larry T. Menefee, J.U. Blacksher, Mobile, Ala., W. Edward Still, Birmingham, Ala., for Leila G. Brown, et al.

Before HILL and ANDERSON, Circuit Judges, and LYNNE *, District Judge.

JAMES C. HILL, Circuit Judge:

This case arises out of a voting rights complaint involving a complex procedural and factual history which we will briefly summarize.[1]

## PROCEDURAL HISTORY

In 1975, plaintiffs (now appellees) who represent a class of all black citizens in Mobile County, Alabama, filed suit against the Board of School Commissioners and its elected officials [hereinafter Board]. Plaintiffs alleged that the county's at-large method of electing Board members impermissibly diluted their voting strength in violation of the fourteenth and fifteenth amendment, and § 2 of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973. The trial court, after a non-jury trial, held for the plaintiffs.[2] The trial court adopted, as a remedy to the discrimination, a plan whereby, the county would be divided into five single-member districts, two containing a majority black population. Board members would be elected from each district; at-large elections would no longer exist.

The Board appealed to the Court of Appeals for the Fifth Circuit, which summarily affirmed the trial court's decision.[3] The Supreme Court vacated and remanded for further proceedings in light of *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Williams v. Brown,* 446 U.S. 236, 100 S.Ct. 1519, 64 L.Ed.2d 181 (1980). The Fifth Circuit then remanded *Brown* to the district court for further proceedings. On remand to the district court, the United States intervened as a plaintiff. Another non-jury hearing was held before the district court. The court concluded that the at-large election system had been adopted and maintained for the purpose of diluting black voting strength, in violation of § 2 of the Voting Rights Act and the fourteenth and fifteenth amendments.[4] Defendant/Appellant Board now appeals from this order.

## FACTS

Mobile County organized the first public school system in the State of Alabama in 1826. The statute enacted at that time specified the number of school board commissioners and the election procedures to be utilized. The election scheme called for at-large voting procedures.

In 1843, a new statute was enacted designating fifteen commissioners by name. However, the statute required that at the

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. The historical facts in this case were vigorously contested. Our statement of facts is taken from the district court's findings of fact and a careful review of the entire record.

2. *Brown v. Moore,* 428 F.Supp. 1123 (S.D.Ala. 1976).

3. *Brown v. Moore,* 575 F.2d 298 (5th Cir.1978).

4. *Brown v. Board of School Commissioners of Mobile County, Alabama,* 542 F.Supp. 1078 (S.D.Ala.1982).

end of the new commissioners' terms, their successors would be elected rather than appointed.

In 1852, the number of commissioners was reduced to twelve and the election procedure was again premised on the at-large voting scheme. Although this statute underwent several amendments between 1852 and 1870, the at-large voting procedure remained the same.

In 1868, during the period known as "reconstruction," the Alabama Constitution provided for a new State Board of Education, with legislative power to enact laws regarding education. Mr. George Putnam was elected to the State Board of Education. During the same year Mr. Putnam was appointed as superintendent of the Mobile County Public Schools. Mr. Putnam planned to institute several new concepts into the Mobile school system which were heavily opposed by a number of whites. Because the "old board" was aware of Mr. Putnam's intent to create black schools, funded by "white money," Mr. Putnam was simply not allowed to post his bond to serve as superintendent. Consequently, Mr. Putnam was not able to assume the duties of his position. Eventually, through the efforts of the State superintendent, the "old board" was removed and Mr. Putnam assumed his position as superintendent. Mr. Putnam appointed a twelve member board of commissioners, three of whom were black. Although the old white board had been officially removed from office, its members continued to assert to the community that they were the only valid board. Both the new board and the old board claimed, simultaneously, to govern the Mobile County school system. After years of struggle between the two Boards, including lawsuits and jail sentences the new Board appeared to have prevailed.

Beginning sometime in 1870, Alabama began a period known as "redemption." During this period many state and local officials sought to regain and restore "white supremacy" to the governmental affairs of the state and to Mobile County. Through state and local elections the Democratic party mounted a major effort to eliminate blacks, and whites who identified with black interests, from holding any public offices. Mr. Joseph Hodgson, a Democratic party member was elected to the position of State Superintendent. As of 1870, the State Board of Education had reinstituted a law restoring the election, rather than appointment, of Mobile school commissioners. This statute provided:

§ 2. Board of commissioners—A board of school commissioners shall take the place of, and act as a board of directors for Mobile County, which board shall be composed of one county superintendent and twelve commissioners, three of which commissioners shall reside not less than seven miles from the courthouse of the present county, and of whom any seven shall constitute a quorum for the transaction of business.

§ 3. Manner of elections—The said superintendent and commissioners shall be elected on the first Saturday of March, 1871, and upon their first meeting the said commissioners shall classify so that four of their numbers shall hold office for two years from the day of election, four of their number for four years, and four of their number for six years, one of each class to be a member from outside the city; their successors to be elected to serve for six years from the day of their election; *Provided, That in the first election for commissioners only nine commissioners shall be voted for on any one ballot, and in succeeding elections only three shall be voted for upon any one ballot.* (emphasis added).

The purpose of allowing the voters to vote for only nine out of the twelve commissioners was to ensure minority representation. The twelve member school board was elected in March, 1871. The Democratic party successfully filled nine of the twelve seats, including the replacement of Mr. Putnam's position. Between 1871 and 1876 no further school board elections were held because the State Board of Education eliminated the two year terms in exchange for six year terms.

The Alabama legislature in 1876 started passing new laws in the spirit of redemption (white supremacy). As a part of the redemption program, the legislature passed a law eliminating the Mobile County School Board election system which had afforded minority access. The 1876 act, replacing the earlier 1870 election procedure, returned to the 1852 at-large election scheme which remained in effect until 1976 when this suit originally commenced. This act again provided for at-large elections on a county wide basis, requiring that two of the new nine member school board must reside within at least six miles of the county courthouse. The 1876 act further provided for staggered six year terms with three commissioners to be elected every two years. Additionally, the restriction against full-ticket balloting was eliminated. This act was amended in 1919, reducing the number of commissioners from nine to five yet still maintaining the at-large election procedure.

### I. Purpose of the remand

The district court, in its original order, neglected to discern whether the at-large voting procedures were created with the intent to discriminate. The plurality opinion issued in *Bolden* concluded that a successful fourteenth amendment dilution claim must demonstrate that the challenged practice was adopted or maintained for a discriminatory purpose. The Supreme Court further concluded that the trial court and the fifth circuit had applied an incorrect standard in determining that the at-large election procedures were violative of the Constitution. Although *Bolden* is a plurality opinion, it appears that six of the justices agree that discriminatory purpose (intent) is a necessary element of a plaintiff's claim of dilution. Additionally, the Court indicated that proof of intent must be substantially more direct than the proof offered in the original *Brown* case.

The trial court, upon remand, received additional evidence, held further hearings and issued a subsequent order in accordance with the new standard enunciated in *Bolden*.

### II. Discriminatory purpose or intent

The plurality opinion issued by the Supreme Court in *Bolden* mandated that a racial vote dilution claimant must prove discriminatory intent. *See also Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The district court, upon remand, and in light of *Bolden* concluded that the creation and maintenance of the Mobile County at-large election procedures were intentionally discriminatory. *See Rogers v. Lodge*, — U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). Appellant Board contends that the evidence was insufficient to support a finding of discriminatory intent. Our standard of review is to determine whether the trial court's findings are clearly erroneous. *Dowdell v. City of Apopka*, 698 F.2d 1181 (11th Cir.1983); *McMillan v. Escambia County*, 688 F.2d 960 (5th Cir.1982). After carefully reviewing the record, we conclude the trial court's findings are not clearly erroneous.[5]

Initially, it is argued that the 1852 enactment providing for at-large election procedures was not passed with a discriminatory intent. We agree. At that point in time there was no motive to dilute or injure the black vote because blacks were not permitted by law to vote.

In 1870, when new legislation was passed, blacks were permitted, for the first time, to vote in the school board commissioners election. The statute regulating voting procedure allowed a voter to cast only nine ballots for twelve commissioners. Appellees presented historical evidence demonstrating

---

**5.** Plaintiffs/Appellees urge this court to affirm the district court's holding based solely upon the 1982 amendment to Section 2 of the Voting Rights Act, enacted after the Supreme Court's decision in *Bolden*. In view of our resolution of the issue of intent, we do not reach that question.

that the purpose of this voting procedure was to secure black representation on the Board.

In 1876, the Alabama legislature repealed the 1870 enactment, substituting the 1852 at-large election procedure which, in essence, removed any possibility of minority representation on the Board. Appellant contends that the 1876 enactment was merely a return to the 1852, original, arrangement and was, therefore, not passed with a discriminatory intent. This is evidenced by the fact that the 1870 act had not provided for single member districts. It is accurate that single member districts were not created by the 1870 enactment. However, the effect of allowing voters to cast nine out of twelve ballots was effective in securing minority representation. Single-member districting is not the only way to achieve this goal. The primary distinction between the 1870 and 1876 enactments is that the former deliberately and explicitly provided for minority representation, while the latter was created by a legislature whose primary goal was the eradication of the advances made by the reconstruction governments to provide equal rights for blacks.

■ The Supreme Court has consistently held that at-large election schemes are not *per se* unconstitutional. *See e.g., White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). However, the maintenance of a purposefully discriminatory vote-diluting at-large districting scheme comes within the purview of the fourteenth amendment. *See Bolden,* 446 U.S. at 66, 100 S.Ct. at 1499. *United States v. Uvalde Consolidated Independent School District,* 625 F.2d 547, 553 (5th Cir. 1980), *cert. denied,* 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981). Although the original enactment of at-large voting procedures prior to 1870 was not rooted in discrimination, the situation created by that enactment made it virtually impossible in

later days for blacks to be elected to any position. When the 1876 Alabama legislature met and undertook to cancel black political opportunities created by the 1870 act, the evidence is persuasive that the new enactment was motivated by discriminatory intent. The 1876 act which reenacted the 1852 Act of at-large voting procedures was a convenient method of making the election of a black board member unlikely, even though that same procedure had not, originally, been the product of discriminatory intent. When the Alabama legislature reinstated a law which suited the purpose of discrimination, the law may be said to have been a product of discriminatory intent, notwithstanding the fact that in its earlier enactment, discrimination was not a factor.

(a) Present Effects of Discrimination

■ The trial court concluded that the evidence in the record demonstrated there still exists present effects of discrimination based on the passage of the 1876 Act.[6] The ultimate findings of the court that:

> The present effects of the at-large system, as a function of its original intent in 1876, is to enhance the discriminatory results of other forms of de jure and de facto discrimination in voting practices and procedures. These other forms of discrimination in turn enhance the present effect of the at-large system, to deny equal access to the political system,
> . . .

are not clearly erroneous. *Brown,* 542 F.Supp. at 1091. The present effects of the discriminatorily motivated act of 1876 further demonstrate the intent behind the passage and maintenance of that Act.

In conclusion, we find that there was sufficient evidence in the record to support the district court's conclusion that the 1876 Act was discriminatorily intended. We further support the district court's conclusions as to the other issues raised in this case and find the remaining errors assigned by the appellant to be without merit.

We AFFIRM.

---

**6.** For a complete review of the district court's findings regarding the present effects of the

1876 act see *Brown,* 542 F.Supp. at 1090–92.