Rev. Roy JONES, et al.,
Plaintiffs-Appellees,

v.

The CITY OF LUBBOCK, et al.,
Defendants-Appellants.

No. 83–1196.

United States Court of Appeals,
Fifth Circuit.

March 5, 1984.

Rehearing and Rehearing En Banc
Denied April 10, 1984.

Travis D. Shelton, T. Dale Jones, John C. Ross, Jr., City Atty., James P. Brewster, Asst. City Atty., Lubbock, Tex., for City of Lubbock et al.

William L. Garrett, Dallas, Tex., Mark C. Hall, c/o John J. O'Shea, Albert Perez, Tomas Garza, Lubbock, Tex., Rolando L. Rios, San Antonio, Tex., for Roy Jones et al.

Lane Arthur, Lubbock, Tex., for Rose Wilson.

Daniel H. Benson, Lubbock, Tex., for plaintiffs-appellees, Roy Jones et al. and plaintiff-intervenor-appellee, Rose Wilson.

Before REAVLEY, RANDALL and HIGGINBOTHAM, Circuit Judges.

RANDALL, Circuit Judge:

The City of Lubbock, Texas, appeals a judgment holding that the City's at-large system of electing members of its city coun-

cil violated both the Fifteenth Amendment to the United States Constitution and section 2 of the Voting Rights Act, 42 U.S.C.A. § 1973 (West Supp.1983). That judgment rests on the district court's findings that the City, at least in part, adopted its electoral system as a means to discriminate against its black citizens, and that the system presently deprives the City's black and Mexican-American citizens of equal access to the electoral process. The City principally contends that the district court clearly erred in making these findings. In addition, the City challenges the constitutionality, and the lower court interpretation, of section 2 of the Voting Rights Act. Finally, the City attacks the propriety of the lower court's remedial districting plan. We affirm in part, and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

According to the 1980 census, the City of Lubbock has a population of 173,979. Of this population, 14,204, or 8.2%, are black, and 31,085, or 17.9%, are Mexican-American. For the most part, this minority population is concentrated in neighborhoods in the eastern and northeastern parts of the City. Over 75% of the black and Mexican-American population resides in these predominately minority areas. The plaintiffs and intervenors represent classes consisting of all the black and Mexican-American voters in the City of Lubbock.

Lubbock is a "home rule" city established in 1909 under Tex. Const. art. II, § 5 and Tex.Civ.Stat.Ann. arts. 1165–1182 (Vernon 1963 & Supp.1982) (as amended). The present city charter, originally enacted in 1917 and amended in 1961, 1964 and 1967, provides for a mayor and a four member city council. The mayor serves a two year term and the council members serve four year terms. The terms of council members are staggered so that two council members come up for re-election every two years. Although the City is divided into voting precincts, the entire City elects the mayor and council at large. Council members need not live in any particular part of the City.

Any resident citizen of Lubbock—with exceptions not relevant here—may run for mayor or the city council by filing for candidacy at least thirty days before elections. To file for city council, a candidate must announce for a particular post on the council. At least since a charter amendment in 1964, a candidate for mayor or city council must receive a majority of votes. Where no candidate in the field attracts a majority vote, the two candidates with largest vote totals enter a run-off election.

The City has only recorded the race and ethnicity of candidates since 1970. Since that time, no black or Mexican-American candidate has run for mayor or city council successfully. Before 1970, the parties have identified only one minority candidate, and that candidate lost. Although two Mexican-Americans have represented Lubbock in elected office, one won a school district election under a plurality-vote system, and the other won an election for state representative from a single-member district that includes only a part of the City.

In 1976, the plaintiffs began this action to require the City to abandon its at-large election system. The complaint alleged that the election scheme not only had resulted in minority electoral defeat, but had also effectively denied Lubbock's black and Mexican-American voters of equal access to the political processes. This deprivation allegedly violated the fourteenth amendment, the fifteenth amendment and section 2 of the Voting Rights Act.

The district court originally conducted a nonjury trial between December 18, 1978, and January 24, 1979. On June 8, 1979, the court issued a comprehensive memorandum opinion finding that the Lubbock at-large election system did not dilute the voting strength of minority voters. Although the court found a history of official discrimination, electoral rules that enhanced the opportunity to discriminate, and a general lack of success by minority candidates, the court believed that the responsiveness of the City to particularized minority needs,

the absence of slating restrictions and the absence of any tenuous justification for the at-large system required a finding in the City's favor. The first appeal to this court ensued.

While that appeal was pending, the Supreme Court announced dramatic changes in the law of voting dilution. In *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court explicitly stated, for the first time, that a claim of denial of access by a minority to the political processes required a showing of a purpose to discriminate. *Id.* at 66–71, 100 S.Ct. at 1499–1501 (plurality opinion of Stewart, J.); *accord id.* at 99–101, 100 S.Ct. at 1516–1517 (White, J., dissenting). A plurality of the Justices, moreover, repudiated the then-prevailing view in this circuit that objective indicia of discrimination could establish intentional voting dilution. *Id.* at 72–74, 100 S.Ct. at 1502–1503 (plurality opinion of Stewart, J.) *See generally Nevett v. Sides*, 571 F.2d 209, 217–29 (5th Cir.1978) [hereinafter cited as *Nevett II*] (intent required, but objective factors can establish intent), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980). Accordingly, we vacated the judgment and remanded to the district court. *Jones v. City of Lubbock*, 640 F.2d 777 (5th Cir.1981). Shortly thereafter, this court withdrew the mandate pending the outcome of another Supreme Court voting dilution case, *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Although, in *Rogers*, the Court reaffirmed that voting dilution claims required a showing of intent, the Court upheld a finding of dilution on the basis of objective indicia of discrimination. *Id.* at 622–27, 102 S.Ct. at 3278–81. We then returned this case to the district court for reconsideration in light of *Rogers. Jones v. City of Lubbock*, 682 F.2d 504 (5th Cir.1982).

While the district court considered the case on remand, Congress worked yet another change in the law of voting dilution by amending the Voting Rights Act. In effect, Congress "overruled" [1] *Bolden.* The district court held further hearings on January 10–13, 1983, and, on January 20, 1983, found that the at-large scheme violated both the fifteenth amendment and section 2 of the Voting Rights Act. Although the court largely adopted its previous findings, additional evidence of polarized voting, and of the circumstances surrounding adoption of the at-large system persuaded the court both that the system had discriminatory results, and that the motives of the original charter committee that adopted the at-large system had been invidious.

The court then proposed redistricting plans, conducted oral argument and, on March 4, 1983, ordered a new plan for the City into effect. The court-ordered plan called for a six member council elected from single-member districts, and a mayor elected at large. The plan retained both the prior terms of office, and the staggered terms for council members.

## II. THE PARTIES' CONTENTIONS.

The City assails the lower court's conclusions on both the constitutional and statutory issues. On the fifteenth amendment issue, the City adopts a position that is straightforward; the factual record in support of intent findings is too weak to survive review under the clearly erroneous rule. On the issue of section 2 of the Voting Rights Act, the City raises constitutional, interpretative and factual challenges. The City argues that: (1) Congress has adopted an unconstitutional standard that is too vague to enforce; (2) Congress exceeded its constitutional authority by proscribing electoral systems without a showing of intent; (3) the Act, by codifying pre-*Bolden* law, effectively readopts a standard of discriminatory purpose; and (4) the trial court misinterpreted section 2 by unduly

1. As mentioned hereafter, Congress has not even purported to "overrule" *Bolden* in the sense of substituting a different interpretation of the substantive meaning of the fourteenth and fifteenth amendments. Nevertheless, Congress, pursuant to its authority under section 5 of the fourteenth amendment and section 2 of the fifteenth amendment, has legislatively proscribed political systems that the constitution might suffer. *See* section V.A. 2., *infra.*

relying on the evidence of polarized voting. Finally, on the issue of remedy, the City maintains that the court adopted a plan that artificially inflates minority voting strength and ensures disproportionate minority representation.

## III. THE FIFTEENTH AMENDMENT.

The standard applicable to fifteenth amendment claims is presently unclear. Before *Bolden,* courts had not analyzed voting dilution claims based on the fifteenth amendment in a manner distinct from claims brought under the fourteenth amendment.[2] The plurality of the Justices in *Bolden,* however, suggested that the fifteenth amendment proscribed only direct interference with registration and voting. 446 U.S. at 61–65, 100 S.Ct. at 1496–1498 (plurality opinion of Stewart, J.). Thereafter; the Supreme Court explicitly indicated that the scope of the fifteenth amendment remained an open question. *Rogers v. Lodge,* 458 U.S. at 619 n. 6, 102 S.Ct. at 3276 n. 6. The parties appear to operate under the assumption that the fifteenth amendment proscribes voting dilution, and that the dilution must be purposeful. *See Nevett II,* 571 F.2d at 220 (fifteenth amendment may only be invoked to challenge purposeful voting dilution). We review the findings under that same assumption.

Both parties recognize that the district court's crucial finding concerns whether the

1917 charter commission that adopted the at-large system intended to exclude black electoral participation. Both parties, moreover, recognize that the finding of intent must rest entirely on evidence concerning one member of the charter commission.

James L. Dow, a charter commission member, owned and edited the Lubbock Morning Avalanche, a newspaper which, at the time, circulated to no more than 700 of Lubbock's 4000 residents. Between 1909 and 1924, editorials appeared on subjects ranging from the black electoral franchise to the very presence of blacks in the City. The editorials contained a series of vile racial slurs. Various editorials took the position that Lubbock's blacks would carry disease, cause crime and invite further influx of blacks into Lubbock. One editorial in 1909 recommended disenfranchising blacks; a second in 1924 warned of black efforts to exert political influence.

Other evidence suggested both that the editor bore responsibility for the paper's views, and that like views prevailed among the City's white citizens. A former employee of the paper described the extent of editorial control that Mr. Dow exercised over the paper. That witness also described the prevelance of Ku Klux Klan influence in the City. An expert witness described the historical background of contemporary reform movements and opined that exclusion of participation by minorities—both ra-

2. Some courts have identified two separate theories under which a plaintiff might show that a redistricting plan discriminates invidiously. *E.g., Zimmer v. McKeithen,* 485 F.2d 1297, at 1304 (5th Cir.1974). According to these cases, a plaintiff may show either a "racially motivated gerrymander"—*Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) is the paradigmatic case—or an apportionment scheme that operates to cancel out the voting strength of a minority group. *E.g., White v. Regester,* 412 U.S. 755, at 766–70, 93 S.Ct. 2332, 2339–41, 37 L.Ed.2d 314. The two lines of cases were theoretically distinct because the latter, or "dilution," line of cases did not, under earlier interpretations, require a showing of intent, while a racial gerrymander did contemplate a showing of intent. *See Zimmer v. McKeithen,* 485 F.2d at 1304. Arguably, these two lines of cases are brought respectively under the fifteenth and fourteenth amendments.

We do not think that the distinction between "gerrymander" and "dilution" cases has clearly survived later developments in the law. Thus, some courts have treated what were essentially racial gerrymander claims as voting dilution cases. *See, e.g., Kirksey v. Board of Supervisors,* 554 F.2d 139, 142–43 (5th Cir.) (en banc) (claim that single-member district lines fragmented cohesive black community), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Furthermore, a dilution claim brought under the constitution must now include proof of discriminatory intent. *Rogers v. Lodge,* 458 U.S. 613, 616–19, 102 S.Ct. 3272, 3275–77, 73 L.Ed.2d 1012 (1982). If this circuit ever has regarded the fourteenth and fifteenth amendment voting rights causes of action as distinct, that distinction has vanished with the coalescence of the "gerrymander" and "dilution" line of cases.

cial and political—provided a partial motive for the movement to at-large government.

 As the City views the evidence, the connection between the appearance of a few editorials over the space of 12 years creates too tenuous a link between the probable views of a single citizen and the driving force behind the charter commission; thus, the City argues, the evidence cannot suffice to sustain the finding of discriminatory intent. To reverse the finding of the district court, of course, we must proceed under the clearly erroneous rule. Fed.R.Civ.P. 52(a); *see, e.g., Rogers v. Lodge,* 458 U.S. at 622–23, 102 S.Ct. at 3278–79; *Chescheir v. Liberty Mutual Insurance Co.,* 713 F.2d 1142, 1148 (5th Cir. 1983). Only if, on a review of the record, we derive the clear impression that a mistake has been made, may we second guess the conclusions of the district judge. *See United States v. United States Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

We note, however, the multiple inferences that this evidence requires. There is no direct evidence that Mr. Dow authored the articles; thus, the evidence must fairly attribute to Mr. Dow the articles' statements. There is no direct evidence that those sentiments affected Mr. Dow's participation in the charter commission; thus, some evidence must suggest that Mr. Dow would have espoused those views in connection with the City's form of government. Finally, there is no direct evidence that Mr. Dow's alleged views influenced the commission's deliberations; thus, some evidence must suggest either that these views played some part in the commission's deliberations or, at least, that other committee members actively shared these views.

The record might persuade us that the first two inferences are sound. The best available evidence suggests that Dow controlled the paper's views to an extent that he is fairly chargeable with at least approving them. We doubt that the district court mistakenly imputed the views to Mr. Dow. Although Lubbock lacked a substantial black population when the charter committee sat, the editorials do espouse an exaggerated concern for keeping both the political system and the City itself free of any black influence. On that basis, we must acknowledge that Mr. Dow could have entertained the possibility of structurally locking blacks out of the political system.

 The sparse record, however, leads us to conclude that the final inference goes too far.[3] Certainly, the paper's circulation and the historical context makes palatable the notion that Dow's views had more than limited appeal. Yet, we know nothing of the other charter commission members. The black population of Lubbock in 1920 consisted of only 66 persons. Particularly in light of pervasive statutory limitations on black participation, the notion that the fifteen charter commission members concerned themselves with adding a superfluous means of ensuring black political powerlessness appears implausible.

We could certainly accept that the Lubbock electoral system effectively maintains the effects of other past denials of access. We might even accept findings that the charter commission would have adopted such a system if its members believed that the black residents represented any genuine political threat. We do not, however, perceive enough evidence to affirm findings that the commission adopted the electoral system, even in part, because it would pre-

**3.** In *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court suggested that a plaintiff may demonstrate intent circumstantially through evidence of: (1) the historical background of the decision; (2) the sequence of events leading up to the challenged decision; (3) procedural or substantive departures from normal decision-making; and (4) statements, including legislative or administrative history,

reflecting on the purpose of the decision. *Id.* at 267–68, 97 S.Ct. at 564–65. Undoubtedly, the evidence here sheds some light on the historical background of the Lubbock at-large system. The record, however, tells us nothing about the events or procedures attending the 1917 initiation of that system. We are asked not to judge intent from the "statements" of the legislative body, but rather those of a single member.

vent blacks from participating in the electoral process.

## IV. THE VOTING RIGHTS ACT.

### A. *Constitutionality.*

As the City characterizes the 1982 amendments to the Voting Rights Act, those amendments purport to overrule the judiciary's interpretation of the constitution and substitute a meaningless standard that penalizes municipalities without sufficiently informing them how to conform their electoral systems to the law. By indefinitely identifying the type of political system that violates section 2 of the Voting Rights Act, Congress, in the City's view, produced a standard so vague that it violates due process. By allegedly interfering with a judicial prerogative—constitutional interpretation—Congress, in the City's view, exceeded its power under section 5 of the fourteenth amendment and section 2 of the fifteenth amendment.

■ Before considering the merits of these claims, we note an oversight in the proceedings below. Notwithstanding the presence of a challenge to the constitutionality of section 2 of the Voting Rights Act, neither the parties nor the district court followed the procedures set forth in 28 U.S.C. § 2403(a) (1982).[4] Those procedures contemplate notice to the Attorney General of the United States, together with an opportunity to intervene. The certification is not discretionary. *See Wallach v. Lieberman,* 366 F.2d 254, 257 (2d Cir.1966); 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1915, at 571 (West 1972).

■ Ordinarily, we would interrupt these proceedings to await the input of the attorney general. In this case, however, two considerations militate in favor of adopting a different procedure. The action has already proceeded to final judgment. The pendency of elections in the City of Lubbock counsels that we adjudicate these issues with dispatch. Accordingly, we invoke the procedure outlined in *Thatcher v. Tennessee Gas Transmission Co.,* 180 F.2d 644, 648 n. 7 (5th Cir.), *cert. denied,* 340 U.S. 829, 71 S.Ct. 66, 95 L.Ed. 609 (1950); *cf. Finch v. Mississippi State Medical Ass'n, Inc.,* 585 F.2d 765, 779 (5th Cir.1978) (adopting same procedure for State certification under 28 U.S.C. § 2403(b)). Upon issuance of this opinion, a copy will be certified to the attorney general. In the event that the attorney general believes that intervention is required, we will promptly entertain his motion for rehearing.

### 1. *Vagueness.*

The City invokes the familiar standard that a statute may not sanction conduct defined in terms so unclear that those regulated must guess whether their actions are lawful or not. *See, e.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). The vagueness of a law not only withholds fair notice of what those regulated may do, but also leaves unwarranted discretion in the hands of enforcement authorities. *E.g., Grayned v. City of Rockford,* 408 U.S. 104, 108–09 & n. 5, 92 S.Ct. 2294, 2298–99 & n. 5, 33 L.Ed.2d 222 (1972). The City complains chiefly of the inadequacy of the section 2 language to inform municipalities how they may structure their electoral systems to insulate them from attack.

---

4. We note that the district court may well have believed that no constitutional challenge was before it. The City did not include the issue in the pretrial order. R. 2, 240–53. At oral argument in the district court, one of the City's lawyers did address the scope of congressional authority to modify Supreme Court interpretations. R. 6, 724–25. A confused exchange between the judge and the lawyer may have led the judge—quite reasonably—to conclude that the City was conceding the constitutionality of section 2. *Id.* at 725–26.

Even if the oral argument before the district court fairly raised the constitutional issue, the failure to incorporate the question into the pretrial order raises a serious waiver question. *Cf. United States v. Vahlco Corp.,* 720 F.2d 885, 890 n. 9 (5th Cir.1983). Neither party has alluded to—much less argued—this question of waiver. Since we believe that the constitutional arguments lack merit, we will address them rather than raise and adjudicate *sua sponte* the question whether the issue of constitutionality has been waived.

Most frequently, the vagueness standard has applied to penal statutes. *Federal Election Commission v. Lance,* 635 F.2d 1132, 1142 (5th Cir.), *cert. denied,* 453 U.S. 917, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981). Nevertheless, a civil statute may require or proscribe conduct so vaguely that it violates due process, *Exxon Corp. v. Busbee,* 644 F.2d 1030, 1033 (5th Cir.1981), *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1982), although such a challenge contemplates a less exacting standard of review. *E.g., id.* at 1033. In *A.B. Small Co. v. American Sugar Refining Co.,* 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925), the Supreme Court stated the rationale for applying vagueness analysis to non-penal regulation:

> It was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard so vague and indefinite as really to be no standard at all. Any other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it, was equally within the principle of those cases.

*Id.* at 239, 45 S.Ct. at 297.

The degree of unclarity that the vagueness standard permits, however, varies according to the nature of the statute, and the need for fair notice or protection from unequal enforcement. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982). Section 2 does not apply to circumstances in which either the need for fair notice or the danger of unfair enforcement is great. Before a penalty, whatever its nature, creates urgent need for notice, that penalty must attach to conduct. *See Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967). Section 2 of the Voting Rights Act sets forth no standard to regulate the conduct of municipal elections. Rather, section 2 devises a standard for determining whether an electoral system, in light of its contemporary effects and historical context, discriminates. Absent an effect on conduct, a statute's standard is not susceptible to attack as vague. *Id.*

Yet, even if one could regard section 2 as regulating conduct, we would find no vagueness. A civil statute would violate due process only if it commanded compliance in terms "so vague and indefinite as really to be no rule or standard at all," *A.B. Small Co.,* 267 U.S. at 239, 45 S.Ct. at 297, or was "substantially incomprehensible." *Busbee,* 644 F.2d at 1033. Even assuming—unjustifiably in our view—that one could not comprehend section 2 of the Voting Rights Act even in light of the voluminous and detailed legislative history, we would, at any rate, first attempt to construe the statute so as to give it meaning. *Federal Election Commission v. Vance,* 635 F.2d at 1142.

### 2. Congressional Authority.

The City's attack on congressional authority includes two related components. In part, the City contends that Congress overstepped its role under the doctrine of the separation of powers by usurping the judicial obligation to interpret the constitution. In addition, the City asserts, neither section 5 of the fourteenth amendment nor section 2 of the fifteenth amendment authorizes Congress to enforce the substantive provisions of those amendments by prohibiting discriminatory results.

The first part of the City's argument carries little weight. Section 2 does not purport to usurp the judicial role of defining the substantive scope of the fourteenth amendment or the fifteenth amendment. Instead, Congress seeks to protect the core values of these amendments through a remedial scheme that invalidates election systems that, although constitutionally permissible, might debase the amendments' guarantees. Congressional power to adopt prophylactic measures to vindicate the purposes of the fourteenth and fifteenth amendments is unquestioned. *See, e.g., City of Rome v. United States,* 446 U.S. 156, 173, 100 S.Ct. 1548, 1559, 64 L.Ed.2d 119 (1980); *South Carolina v. Katzenbach,* 383 U.S. 301, 323–24, 86 S.Ct. 803,

815–16, 15 L.Ed.2d 769 (1966). So long as Congress adopts lawful and rational means to enforce the constitution, the separation of powers doctrine requires that the judiciary, rather than Congress, must defer. Even if the judiciary may deem the congressional course as unwise, the courts must acknowledge the nature of the limits that circumscribe congressional power:

> Let the end be legitimate. Let it be within the scope of the constitution and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consist with the letter and spirit of the constitution are constitutional.

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 341, 4 L.Ed. 579 (1819).

When Congress has wielded its authority under the fourteenth and fifteenth amendments, Justices of the Supreme Court have often differed over the wisdom or rationale for a measure, but the Court has usually upheld the congressional action. *See generally City of Rome v. United States,* 446 U.S. at 177–78, 100 S.Ct. at 1561–62; *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *South Carolina v. Katzenbach,* 383 U.S. at 323–37, 86 S.Ct. at 815–23. On those occasions when the Court has stricken enactments as exceeding congressional power under the enforcement clauses of the fourteenth or fifteenth amendments, the con-

gressional objective has usually deviated from the central purposes of those amendments—to ensure black equality. *See Oregon v. Mitchell,* 400 U.S. at 129–30, 91 S.Ct. at 267 (opinion of Black, J.) (statutory right for 18 year old to vote in state elections too far removed from interest in preventing racial discrimination in voting); *id.* at 294–96, 91 S.Ct. at 349–50 (opinion of Stewart, J.) (18 year old vote provisions too far removed from interest in remedying past discrimination or preventing present discrimination). Striking down section 2 would require that we find the statute substantially less rational or substantially less justified by congressional findings than the rest of the Voting Rights Act, which has gained judicial approval. We do not so find.[5]

Congress heard extensive testimony showing that the full exercise of the franchise by American minorities still suffered from the effects of electoral systems that hinder minority input into the nation's decision-making. *See, e.g.,* Hearings Before the House Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, 97th Cong., 1st Sess. on Extension of the Voting Rights Act 986–95 (U.S. G.P.O.1982) [hereinafter cited as House Hearings] (MALDEF testimony on continuing electoral abuses in Texas); *id.* at 590–751 (Lawyers Committee on Civil Rights Under Law testimony on voting discrimination in Mississippi); *id.* at 590–671 (ACLU and NAACP testimony on lack of access to political processes in Georgia). Congress carefully considered whether the present

---

**5.** Various Justices have proposed limitations on the rationality and propriety of congressional enforcement authority. Congress may not indirectly repeal other provisions of the constitution or violate the substantive guarantees of the amendments. *Fullilove v. Klutznick,* 448 U.S. at 528 n. 7, 100 S.Ct. at 2800 n. 7 (Stewart, J., dissenting); *id.* at 548 & n. 23, 100 S.Ct. at 2810 & n. 23 (Stevens, J., dissenting); *Oregon v. Mitchell,* 400 U.S. at 128, 91 S.Ct. at 266 (opinion of Black, J.); *Katzenbach v. Morgan,* 384 U.S. at 651 n. 10, 86 S.Ct. at 1724 n. 10. Although the fourteenth and fifteenth amendments empower Congress to limit the authority of states and local governments to govern themselves, *City of Rome v. United States,* 446 U.S. at 178–80, 100 S.Ct. at 1562–63, Congress

may not lightly strip the states of this authority. *See Oregon v. Mitchell,* 400 U.S. at 128, 91 S.Ct. at 266 (opinion of Black, J.); *id.* at 293–96, 91 S.Ct. at 348–50 (opinion of Stewart, J.).

We find no basis to believe that Congress has violated any other provision of the constitution or retracted any protections recognized by the fourteenth amendment or the fifteenth amendment. Indeed, the City has not suggested as much. As noted *infra,* we do not believe that Congress lightly interfered with state and municipal self-government. In light of the legislative fact-finding and the limited nature of the intrusion into state and municipal self-determination, we find no deviation from any of these proposed limitations on Congressional authority.

constitutional jurisprudence adequately protected minority voting rights. *E.g.,* S.Rep. No. 417, 97th Cong., 2d Sess. 16, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 193; H.R.Rep. No. 227, 97th Cong., 1st Sess. 29 (1981); House Hearings, *supra,* at 1189 (statement of Joaquin Avila); *id.* at 852 (statement of Rev. John Nettles). Congress reflected upon the propriety of the measure in light of the constitutional limits on its enforcement power. *See* S.Rep. No. 417 at 39–43, 1982 U.S.Code Cong. & Ad.News at 219–21 (concluding that amendments comported with Supreme Court analysis in *Fullilove, Mitchell, South Carolina v. Katzenbach* and *Katzenbach v. Morgan* ).[6]

▮ Acting on this record, Congress, in our view, could appropriately determine that a "results" test was necessary to enforce the fourteenth and fifteenth amendments. Assigning a non-intent standard to an enforcement measure does not pose a serious constitutional obstacle. *City of Rome v. United States,* 446 U.S. at 173–75, 100 S.Ct. at 1559–60. Where Congress, on the basis of a factual investigation, perceives that a facially neutral measure carries forward the effects of past discrimination, Congress may even enact blanket prohibitions against such rules. *See South Carolina v. Katzenbach,* 383 U.S. at 334, 86 S.Ct. at 821 (literacy tests). Here, Congress

has taken the more modest step of shifting to states and municipalities the burden of accommodating their political systems when that system seriously prejudices minority groups, even though the result is either unintended or, at least, not demonstrably intended.

### B. Construction of Section 2 of the Voting Rights Act.

In essence, the City's argument concerning the interpretation of section 2 asks us to find that Congress meant to adopt a standard exactly opposite to the one explicitly set forth by the statute. The City posits that Congress defined the meaning of section 2 by referring to the case law before *Bolden.* Codifying pre-*Bolden* law, the City maintains, reimposes an intent standard because both the Supreme Court and this court have held that voting dilution claims always turned on a showing of intent.[7] *See generally Bolden,* 446 U.S. at 65–70, 100 S.Ct. at 1498–1501 (plurality opinion of Stewart, J.); *Nevett II,* 571 F.2d at 217–21. We begin by briefly recounting the developments in voting dilution jurisprudence in order to place the parties' arguments into perspective.

Voting rights law has been transformed throughout the seven years that this case

---

**6.** Recently, Judge Politz of this court extensively canvassed the rationale and constitutionality of section 2 in *Major v. Treen,* 574 F.Supp. 325, 342–49 (E.D.La.1983) (three judge district court). Our views accord with that analysis:

> Empirical findings by Congress of persistent abuses of the electoral process, and the apparent failure of the intent test to rectify those abuses, were meticulously documented and borne out by ample testimony. Based on these findings the legislators reasonably concluded that substantial amelioration of a dilution plaintiff's statutory burden was warranted. Although ostensibly contradictory of the Supreme Court's holding in *Bolden,* we perceive § 2 as merely prescribing a potion to remove vestiges of past official discrimination and to ward off such discrimination in the future. Congress has not expanded the Constitution's substantive guarantees, but simply redefined and strengthened the statutory protections around core constitutional values, thus exercising its authority within the confines of the Constitution.

574 F.Supp. at 347 (footnotes omitted).

**7.** The development of the constitutional jurisprudence on voting dilution has not lacked for instances in which courts have arguably revised the meaning of earlier cases. In the Supreme Court, for example, the *Bolden* plurality abruptly announced that the *White v. Regester* case, which contemporary courts had viewed as a "results" case, required a showing of discriminatory intent. *See Bolden,* 446 U.S. at 68–70, 100 S.Ct. at 1500–1501 (plurality opinion of Stewart, J.). Even the author of the opinion in *White v. Regester* apparently agreed. *See Bolden,* 446 U.S. at 101–03, 100 S.Ct. at 1517–18 (White, J., dissenting). A panel of the Fifth Circuit undertook a similar reinterpretation of *Zimmer v. McKeithen. See Nevett II,* 571 F.2d at 220–28. In both instances, fellow jurists criticized what they perceived as an inconsistency. *See Bolden,* 446 U.S. at 103–41, 100 S.Ct. at 1518–39 (Marshall, J., dissenting); *Nevett,* 571 F.2d at 231–38 (Wisdom, J., specially concurring).

has been pending. Arguably, as many as six slightly different standards have applied in voting dilution cases during this period.[8] To date, neither the Supreme Court nor this court has extensively considered the interpretation of section 2 of the Voting Rights Act.

### 1. The Objective Factor Test 1973–1977.

Before 1973, the Supreme Court had recognized, at least in dicta, that electoral schemes might violate the constitution by minimizing or cancelling out the voting strength of racial or political minorities. *Whitcomb v. Chavis*, 403 U.S. 124, 142–44, 91 S.Ct. 1858, 1868–69, 29 L.Ed.2d 363 (1971); *Burns v. Richardson*, 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). The Court first held that an electoral scheme unconstitutionally diluted the voting strength of minority groups in *White v. Regester*, 412 U.S. 755, 765–70, 93 S.Ct. 2332, 2339–41, 37 L.Ed.2d 314 (1973). To establish dilution, the Court required a plaintiff "to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents to participate in the political processes and to elect legislators of their choice." *Id.* at 766, 93 S.Ct. at 2339.

Although *Regester* never unambiguously stated whether a voting dilution claim con-templated a showing of discriminatory purpose, lower courts, including this court, focused on the quality of the evidence that the *Regester* Court had deemed sufficient. In *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), this court analyzed the evidence relied upon in *Regester* and identified evidentiary factors to distinguish discriminatory election schemes from those that merely prevented a minority from achieving proportional representation. *Id.* at 1305–07.

Recognizing that at-large schemes do not *per se* violate the constitution, the *Zimmer* court posited that four factors principally pointed to a discriminatory electoral scheme: (1) a lack of minority access to the process of slating candidates; (2) the unresponsiveness of the legislative body to particularized minority needs; (3) a tenuous official policy underlying the preference for the electoral scheme; and (4) past discrimination that precluded effective political participation. *Id.* at 1305. In addition, the court recognized that particular features of the electoral system would enhance the inference of discrimination: (1) the use of large election districts; (2) majority vote requirements; (3) anti-single shot voting provisions; and (4) the lack of subdistrict residency requirements. *Id.* Evidence that the "aggregate of these factors" existed established dilution. *Id.*

**8.** Although courts and scholars may adopt differing views of the meaning of these cases, the following cases arguably applied the following distinct tests:

1. *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1974) (en banc) ("results" test based on objective "primary" and "enhancing" factors), *aff'd on other grounds sub nom. East Carroll Parish Schl. Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975).

2. *Kirksey v. Bd. of Supervisors*, 554 F.2d 139 (5th Cir.) (en banc) (*Zimmer* test with additional requirement that plaintiff show continuation of effects of past official discrimination), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

3. *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978) (intent test based on "totality of circumstances" under *Zimmer* factors), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980).

4. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion) (showing of discriminatory purpose through direct or indirect evidence).

5. *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (intent test which can be satisfied by evidence of objective factors under *Zimmer* and *Nevett*).

6. 42 U.S.C.A. § 1973 (West Supp.1983) ("results" based on totality of circumstances in light of objective evidentiary factors).

*2. The Intent Requirement.*

Beginning in 1976, the Supreme Court decided a series of cases that considered equal protection challenges to facially neutral state rules and procedures. The Court determined that the equal protection clause did not invalidate such rules or procedures merely because they disproportionately affected minorities. *See Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (veterans preference rule for civil service exam that benefited male applicants disproportionately); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (refusal to grant zoning variance to build low-income housing which would primarily benefit black residents); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (language test for police officers that black applicants failed in disproportionately large numbers). In each case, the Court required direct or indirect evidence sufficient to show a purpose to discriminate. *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293; *Arlington Heights,* 429 U.S. at 270, 97 S.Ct. at 566; *Davis,* 426 U.S. at 239–42, 96 S.Ct. at 2047–49.

In light of these cases, lower courts faced the task of reconciling the dissonant analysis in voting dilution cases based on the equal protection clause with the unequivocal message of *Davis*—that discriminatory impact did not suffice. Initially, this court determined that a voting dilution case did not necessarily require intent where a political system demonstrably continued the effects of historical discrimination. *Kirksey v. Board of Supervisors of Hinds County,* 554 F.2d 139, 147–48 & n. 16 (5th Cir.) (en banc), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). In *Nevett II,* 571 F.2d at 217–21, the court emphasized that *Davis* and *Arlington Heights* required that a fourteenth amendment claim of voting dilution satisfy the purpose standard generally applicable in equal protection cases.

Reaffirming the observation in *Kirksey,* the *Nevett II* court proposed three means by which a plaintiff could meet the purpose standard. A plaintiff could demonstrate either through direct or circumstantial evidence that the government body adopted the electoral scheme with a discriminatory purpose, that the government body maintained the scheme with discriminatory purpose, or that the system furthered preexisting intentional discrimination. *Id.* at 221. The *Nevett* court, moreover, indicated that courts could determine the existence of discriminatory purpose within the framework of the *Zimmer* analysis. 571 F.2d at 222–23. Indeed, the court observed that two *Zimmer* factors—unresponsiveness and tenuousness—bore little relevance to issues other than intent. *Id.* at 222. The *Zimmer* factors, the *Nevett* court stated, inform courts of the type of circumstantial evidence that would show intentional vote dilution. By weighing the "significance and strength" of the evidence, the district court could determine whether a minority's voting strength had been intentionally diluted. *Id.* at 226.

On the same day as the decision in *Nevett II,* the same panel of this court decided *Bolden v. City of Mobile,* 571 F.2d 238 (5th Cir.1978), *rev'd and remanded,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Applying the standards articulated in *Nevett,* the court affirmed a district court finding of voting dilution based on the *Zimmer* factors. The court concluded that the evidence demonstrated that the City had maintained an at-large system for discriminatory purposes. *Id.* at 246.

The Supreme Court reversed. Without agreeing on a single majority opinion, the Court rejected pre-*Davis* voting dilution law and cast doubt on the viability of this court's analysis in *Nevett II.* A majority of the Justices agreed that a government body must deliberately discriminate before a federal court may invalidate an election scheme. *Bolden,* 446 U.S. at 66–71, 100 S.Ct. at 1499–1501 (plurality opinion of Stewart, J.); *id.* at 99–101, 100 S.Ct. at 1516–1517 (White, J., dissenting). The plurality, however, went on to reject the *Zimmer* factors as any meaningful means of

assessing intent to discriminate. The plurality characterized the objective factors endorsed in *Zimmer* and *Nevett II* as "far from proof" of purpose. 446 U.S. at 72–74, 100 S.Ct. at 1502–1503.[9]

The lack of consensus among the Justices resulted in lower court confusion. In this circuit, several panels struggled to decipher the central message of *Bolden*. While all the cases acknowledged—as indeed *Nevett II* had—that the record must support findings of intent, they differed in their evaluation of the extent to which the *Zimmer* analysis survived *Bolden*. *See Lodge v. Buxton,* 639 F.2d 1358 (5th Cir.1981), *aff'd sub nom. Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Corder v. Kirksey,* 639 F.2d 1191 (5th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983); *McMillan v. Escambia County,* 638 F.2d 1239 (5th Cir.1981), *vacated on rehearing,* 688 F.2d 960 (5th Cir.1981), *probable jurisdiction noted,* —— U.S. ——, 103 S.Ct. 1766, 76 L.Ed.2d 341 (1983). In *Rogers,* the Supreme Court affirmed the invalidation of an at-large scheme based largely on findings derived from *Zimmer* factors. 458 U.S. at 621–31, 102 S.Ct. at 3278–83.

### 3. *Congressional Response to* Bolden.

Before the Supreme Court decided *Rogers,* Congress reacted to the decision in *Bolden*. In June of 1982, Congress amended section 2 of the Voting Rights Act to prohibit electoral practices and procedures that created discriminatory results even though the responsible government body had not installed or maintained the electoral practice or procedure in order to discriminate. Originally, the Act had merely tracked the language of the fifteenth amendment, the Voting Rights Act of 1965, Title I, § 2, 79 Stat. 437, and the *Bolden* plurality had construed its provisions as coextensive with the fifteenth amendment. 446 U.S. at 60–61, 100 S.Ct. at 1495–1496 (plurality opinion of Stewart, J.). As amended, the statute reads:

> (a) No voting qualification or prerequisite to voting, standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [which applies the Act's protection to members of any language minority], as provided in subsection (b) of this section. (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance that may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973 (West Supp.1983).

The definitional language in subsection (b) derives from the opinion in *White v.*

---

**9.** The plurality views on the *Zimmer* factors could not muster support from other Justices. Justice Blackmun concurred in the result solely because he regarded the lower court's remedy as an abuse of discretion. 446 U.S. at 80–83, 100 S.Ct. at 1506–1508 (Blackmun, J., concurring). Justice Stevens agreed that the *Zimmer* factors did not offer a meaningful standard, but rejected any consideration of subjective intent. 446 U.S. at 90–92, 100 S.Ct. at 1511–1513 (Stevens, J., concurring). While Justices Marshall and Brennan did not believe that intent should control voting dilution cases, 446 U.S. at 94, 100 S.Ct. at 1513 (Brennan, J., dissenting); *id.* at 103–41, 100 S.Ct. at 1518–1539 (Marshall, J., dissenting), they agreed with Justices Blackmun and White that the *Zimmer* factors could establish voting dilution whether or not it was intentional. *Id.* at 80, 100 S.Ct. at 1506 (Blackmun, J., concurring); *id.* at 94, 100 S.Ct. at 1513 (Brennan, J., dissenting); *id.* at 99–101, 100 S.Ct. at 1516–1517 (White, J., dissenting); *id.* at 136–39, 100 S.Ct. at 1537–38 (Marshall, J., dissenting).

*Regester,* 412 U.S. at 766, 93 S.Ct. at 2339. Congress adopted the language to signify that the statute codifies pre-*Bolden* voting dilution law. H.R.Rep. No. 227 at 29–30; S.Rep. No. 417 at 28–29, 1982 U.S. Code Cong. & Ad.News at 206–07. As an interpretative aid, the legislative history enumerated typical objective factors to guide the courts in analyzing the discriminatory results of an election system:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinders their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 417 at 28–29, 1982 U.S.Code Cong. & Ad.News at 206–07; H.R.Rep. No. 227 at 30; *cf. White,* 412 U.S. at 766–70, 93 S.Ct. at 2339–41; *Zimmer,* 485 F.2d at 1305. In addition, Congress cited two other factors that might have limited relevance:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous.

S.Rep. No. 417 at 29, 1982 U.S.Code Cong. & Ad.News at 207; *cf. Zimmer,* 485 F.2d at 1305.

Clearly, *Zimmer* and *White* inspired both the language of the statute and the legislative explanation of its meaning. Moreover, the statute aims at ensuring continuity with prior law. Blind reliance on *White v. Regester,* however, may not necessarily provide the most accurate index of the congressional meaning in amending section 2. Whether or not *White* and early lower court cases are best construed as purpose cases does not control.[10] At the same time as it adopted early case law, Congress unequivocally expressed its understanding that pre-*Bolden* law evaluated the discriminatory nature of election systems solely on the basis of objective criteria. S.Rep. No. 417 at 19–24, 27–28, 1982 U.S.Code Cong. & Ad.News at 192–202, 204–06.

Congress has made clear its understanding that a court under section 2 should apply *White* and *Zimmer* as purely "results" cases. *See* S.Rep. No. 417 at 28 n. 111, 1982 U.S.Code Cong. & Ad.News at 205–06 n. 111 ("This committee does not adopt any view of *White* as requiring plain-

---

**10.** Although *Regester* never alludes to purpose as fundamental to its standard of proof, *Bolden* construes the case as requiring proof of purposeful discrimination. 446 U.S. at 66, 69, 100 S.Ct. at 1499, 1500 (opinion of Stewart, J.); *id.* at 97–99, 100 S.Ct. at 1515–1516 (White, J., dissenting). Under *Bolden* and its progeny, Justice White's articulation of the "burden of proof"—the source of the language of amended

section 2—must mean, if anything, that denial of access to the political process would state a prima facie case of purposeful voting dilution. The language of section 2, however, treats the passage in a fundamentally different fashion; amended section 2 regards the same showing of denial of access as establishing a violation of the Act.

tiff to meet some 'objective design' test that is, in effect, a version of the 'foreseeable consequences' test of tort law."); 128 Cong.Rec. H3841 (daily ed. June 23, 1982) (remarks of Rep. Sensenbrenner).[11] *See also* S.Rep. No. 417 at 19–24, 1982 U.S.Code Cong. & Ad.News at 196–202 (reviewing prior case law and congressional understanding of *White*). Thus, whatever the proper interpretation of early voting dilution cases may be, Congress has set the courts to the task of giving them meaning as "results" cases. *See generally Buchanan v. City of Jackson,* 708 F.2d 1066, 1071–72 (6th Cir.1983) (no need to inquire into purpose under amended section 2).

 We cannot adopt the City's position that Congress absent-mindedly reimposed a standard that the legislative history so carefully rejects. No court that has considered amended section 2 has adopted the City's view of the congressional intent. The statute itself and the legislative history require that we conclude that the test is one of "results." *E.g., Buchanan,* 708 F.2d at 1071–72; *McMillan v. Escambia County,* 688 F.2d 960, 961 n. 2 (5th Cir.1982), *probable jurisdiction noted,* —— U.S. ——, 103 S.Ct. 1766, 76 L.Ed.2d 341 (1983).

### C. The District Court's Findings.

The City next urges that we reject as clearly erroneous the court's findings as to one of the congressional factors—polarized voting. They attack the accuracy of plaintiffs' evidence of polarization, its significance in light of the court's findings on responsiveness and the degree of reliance the court placed on the evidence of polarization. In response, plaintiffs contend that the court's findings of responsiveness and of a lack of a tenuous justification for the electoral system are clearly erroneous. With the caveats that follow, we find no clear error.

### 1. Polarized Voting.

Expert testimony provided a substantial basis from which the court could have found polarization. In the initial trial, Dr. Charles Johnson, plaintiff's expert, testified that minority candidates received an average of only 11% of the vote in predominately anglo precincts in Lubbock compared to an average of 63% of the vote in predominately minority areas. At the second trial, Dr. Robert Brischetto introduced polarization studies purporting to show that the race or ethnicity of a candidate overwhelmingly determined voter preference.

Without disputing these studies, the City emphasizes that minority candidates have succeeded with the support of the anglo community in elections for the school board. These electoral successes purportedly demonstrate that a qualified minority candidate can succeed in elections in Lubbock, and that the results of polarization are not severe. Like the district court, we place little reliance on this evidence. Unlike city council elections, the school board elections did not feature a majority vote requirement.

---

11. As Rep. Sensenbrenner, one of the House Subcommittee members, made clear:

Let there be no question then. We are writing into law our understanding of the test in White against Regester. And our understanding is that this looks only to the results of a challenged law, in the totality of the circumstances—with no requirement of proving purpose. But should the Highest Court in the land—or a majority of the Court—conclude there is a purpose element in White, then the committee nonetheless has drafted a bill that does not incorporate this requirement, and that is the ultimate legislative intent of the bill we are adopting here today.

. . . . .

The test to be applied against the totality of circumstances as set out in White against

Regester and the case law under it. [sic] That test does not depend upon any finding or inference of intent, nor does it require—as some have erroneously suggested—a finding that there are barriers to the process of registration and voting themselves. Thus, the problems of discriminatory slating and language difficulties in the White against Regester case are important factors to be considered along with other factors such as racial bloc voting and the other types of factors, but they are not essential prerequisites, if other relevant factors can be shown which in the aggregate add up to the discriminatory result.

128 Cong.Rec. at H3841.

Furthermore, the testimony established differences between school district and city council elections that cast doubt on the probity of school district voting patterns to demonstrate the extent of polarization in Lubbock. Until recently, school district elections were held on a date separate from the city council elections. Low voter turnout, and an electorate highly interested in educational issues, characterized school board elections.

Finally, the City urges that the district court's finding of responsiveness substantially undercuts any statistical showing of polarized voting. Our cases have acknowledged that, as one invidious result, polarized voting allows officeholders to disregard minority interests without fear of political consequences. Accordingly, a showing of unresponsiveness and polarized voting can combine to demonstrate "intentional exploitation of the electorate's bias." *Nevett II*, 571 F.2d at 223. Without unresponsiveness, the City contends, polarized voting lacks significance.

We do not agree. While combining polarized voting and unresponsiveness may make a plaintiff's case "strong," *id.*, the absence of unresponsiveness does not negate other inferences that flow from polarization. Whether or not City officials do ignore minority interests, polarization nevertheless frees them of political reprisal for disadvantaging the minority community. *Rogers v. Lodge*, 458 U.S. at 623, 102 S.Ct. at 3279; *Nevett II*, 571 F.2d at 223 & n. 16; *NAACP by Campbell v. Gadsden County School Board*, 691 F.2d 978, 983 (11th Cir.1982). Moreover, polarized voting confirms that race, at least subtly, remains at issue in the political system. *Rogers*, 458

U.S. at 623, 102 S.Ct. at 3279; *Nevett II*, 571 F.2d at 223 n. 16; *Terrazas v. Clements*, No. 3–81–2205–R, slip op. at 37 n. 25 (N.D. Tex., January 4, 1984) (three judge district court).

Furthermore, we reject the City's implicit premise that responsiveness provides an essential element of an action under section 2. Even a dilution claim under the constitution does not require unresponsiveness. *Rogers*, 458 U.S. at 625 n. 9, 102 S.Ct. at 3280 n. 9. Under a results test, Congress has expressly disapproved excessive reliance on responsiveness. S.Rep. No. 417 at 29 & n. 116, U.S.Code Cong. & Ad. News at 207 & n. 116. Whether, under the totality of circumstances, responsiveness defeats plaintiffs' claims is a matter we will consider *infra*.

### 2. Responsiveness.

For their part, plaintiffs contend that the district court clearly erred in finding responsiveness without addressing plaintiffs' contrary evidence. They point out that many City policies favorable to minorities resulted primarily from the impetus of lawsuits, demonstrations or adverse publicity. Moreover, they maintain that most evidence of equal provision of municipal services carries little weight because federal programs targeting minority areas supplied the funds.

We cannot conclude that the district court clearly erred in concluding that plaintiffs did not establish a significant lack of responsiveness to the particularized needs of minorities. Minority areas do receive a substantial share of municipal services, albeit largely on the strength of federal funding.[12] The City's affirmative

---

12. The dependency on federal funds for most of the City's "responsive" spending becomes clear upon examination of the exhibits summarizing the disposition of community development block grants. D.Exhs. 19, 22, 23. Many of the projects that formed the basis of the district court's findings on equal provision of municipal services derived their funding from the community development block grants. That program has, as its primary objective:

the development of viable urban communities, by providing decent housing and a suit-

able living environment and expanding economic opportunities, principally for persons of low- and moderate-income.

24 C.F.R. § 570.302 (1983). The City must certify that:

its community development program has been developed so as to give maximum feasible priority to activities that will benefit low- and moderate-income families....

*Id.*

action plan has increased the share of public employment enjoyed by minorities, albeit not in the most highly paid or responsible positions.[13] City officials have acted on a number of projects of special interest to Lubbock's black and Mexican-American communities, albeit perhaps without the speed or degree of willingness that the minority communities desired.

At the same time, the district court overstated matters by declaring that "overwhelming evidence establishes a real responsiveness by the City of Lubbock." Substantial unaddressed evidence suggested that demonstrations or protest often attended the decision-making process in instances where the City did respond to minority needs.[14] Substantial unaddressed evidence suggested that the City used the police force in attempts to curtail protest or public meetings by minorities.[15] Substantial unaddressed evidence suggested that the City has used one advisory body—the Lubbock Human Relations Commission—as a means of channeling, and often ignoring, minority input.[16] While we would hardly reverse the finding of responsiveness on the basis of this evidence alone, we would expect explicit credibility findings before lightly disregarding it.

We also note that the circumstances suggest that much of the affirmative evidence of responsiveness is suspect. The City cannot take credit entirely for the equal provision of City services; the funds for these derived largely from federal programs aimed at economically depressed areas. *See Perkins v. City of West Helena,* 675 F.2d 201, 210 n. 12 (8th Cir.1981), *aff'd,* 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). Furthermore, much of the evidence of responsiveness concerns programs initiated in the years during which this action has been pending. Actions taken during the course of litigation in which the degree of responsiveness has been an important evidentiary issue cannot be decisive of past and future conduct by the City.

Despite these difficulties in the evidence, we cannot conclude that the evidence of unresponsiveness clearly preponderates. Nor can we discern clear error. If the court had relied on this evidence as a factor strongly militating against relief, we might be inclined to require further findings. The district court, however, regarded the evidence as inconclusive in light of the diminished role responsiveness plays under the results test. We agree that the weakness

**13.** Stipulated Exhibits AA through II contain breakdowns of the racial and ethnic composition of the City work force and its change over the period during which the affirmative action program has been in force. While in terms of sheer numbers, blacks and Mexican-Americans are well-represented in the work force, the distribution of minority workers by job category reveals that blacks and Mexican-Americans are most heavily represented in service and maintenance or clerical positions, and underrepresented in administrative, professional and paraprofessional positions. Stip.Exhs. EE–GG; Exhs. SS–13 to SS–22.

**14.** For example, one witness testified about the relationship between protests in Lubbock during the 1970s and the movement toward increased minority hiring by the City. Supp.R. 8, 825–26 (testimony of Andres Tijerina). Another witness related how the city council permitted the Mexican-American community to adopt a Mexican name for one neighborhood park after members of the Mexican-American community mobilized media attention. Supp.R. 9, 1023–26 (testimony of Gilbert Herrera).

**15.** So, for example, there was testimony that the City imposed a curfew in minority neighborhoods following the police shooting of a black youth. Supp.R. 7, 568–70 (testimony of Thomas Patterson). Another witness, a priest, related instances of harassment after he held public meetings. Supp.R. 9, 965–66. The same witness reported harassment of his parishioners after public meetings at his church. *Id.* at 966–71.

**16.** Several witnesses, including former members of the Human Relations Commission, testified about their own impressions—as well as the impressions of the minority communities generally—that the commission was a "front" or "game" that created only the appearance of minority input. Supp.R. 5, 174–77 (testimony of Gene Gaines); Supp.R. 6, 338–407 (testimony of Wayne Dickey); Supp.R. 7, 571–72 (testimony of Thomas Patterson). One witness related that a former mayor of Lubbock flatly told him that the commission should not involve itself in the operation of other governmental bodies in the City. Supp.R. 6, 450–51 (testimony of Luciano Perez).

of the evidence and the legislative history of section 2 relegates the evidence of responsiveness, in the context of this case, to secondary importance.

### 3. Tenuousness.

The plaintiffs also contend that we should find tenuousness as a factor militating against the lawfulness of the Lubbock at-large election system. Tenuousness, they argue, requires not a showing of pretext, but rather a showing merely that no strong policy underlies use of the at-large system. See Zimmer, 485 F.2d at 1305.

As the district court originally found, the record does not elucidate the precise policies underlying the Lubbock at-large system. We have already found that the evidence does not bear out a finding that discriminatory purpose motivated adoption of the system. Our cases require that we regard this factor as inconclusive. See Cross v. Baxter, 604 F.2d 875, 884–85 (5th Cir.1979), vacated, 704 F.2d 143 (5th Cir.1983); Hendrix v. Joseph, 559 F.2d 1265, 1270 (5th Cir.1977). Particularly in light of the diminished importance this factor has under the results test, S.Rep. No. 417 at 29 & n. 117, 1982 U.S.Code Cong. & Ad.News at 207 & n. 117, we doubt that the tenuousness factor has any probative value for evaluating the "fairness" of the electoral system's impact. See id.

### D. The Totality of the Circumstances.

We next consider the district court's finding that, in the totality of circumstances, Lubbock's at-large system deprives minority citizens of access to the political process. Under the best of circumstances, this court has never regarded a finding of a denial of access as an easy one either to reach or review. In the present case, the changing nature of the applicable standard greatly complicated the district court's determination. We begin by summarizing what the findings, in light of our prior cases, reveal about the Lubbock electoral scheme.

The findings establish political conditions that disadvantage minorities. In the past, the State of Texas and the City of Lubbock discriminated against blacks and Mexican-Americans. Combined with socioeconomic disadvantage resulting from general discrimination, official discrimination has contributed to less frequent and less effective minority participation. See Cross v. Baxter, 604 F.2d at 880 & n. 9; Kirksey v. Board of Supervisors, 554 F.2d at 143–44. See also Rogers v. Lodge, 458 U.S. at 624–25, 102 S.Ct. at 3279–80. Polarized voting, to a great extent, has rendered and continues to render minority political support for elected officials unnecessary. Nevett II, 571 F.2d at 223; see Rogers v. Lodge, 458 U.S. at 623, 102 S.Ct. at 3279. The persistence of polarization, moreover, signals that race and ethnicity still significantly influence the electorate's preferences. Id.; Nevett II, 571 F.2d at 223 n. 16.

The Lubbock at-large system aggravates the political disadvantage of the City's minorities. Even under the best of circumstances, at-large districts tend to debase the value of a minority's political strength. See Whitcomb v. Chavis, 403 U.S. at 159, 91 S.Ct. at 1877. The Lubbock majority vote requirement further submerges the political strength of minorities. Rogers v. Lodge, 458 U.S. at 627, 102 S.Ct. at 3281. Lubbock's staggered terms and numbered posts create head-to-head races and promote majority-minority confrontation. Id.; City of Rome v. United States, 446 U.S. at 185 & n. 21, 100 S.Ct. at 1565 & n. 21; Nevett II, 571 F.2d at 217 n. 10. The system effectively prevents single shot voting. The lack of a subdistrict residency requirement has allowed residents of predominately anglo areas to dominate city office. Rogers v. Lodge, 458 U.S. at 627, 102 S.Ct. at 3281.

In combination, these conditions and this system have predictable effects. No minority candidate ever has served on the Lubbock city council. At least in recent years, every mayor and city council member has resided in the overwhelmingly anglo neighborhoods in Lubbock. Without a breakdown in the pattern of polarized voting, no minority candidate is ever likely to serve on an at-large city council. Neither black nor Mexican-American voters, whether voting

separately or as a coalition, are ever likely to elect a candidate of their choice in Lubbock without substantial anglo support. Lubbock's voting preferences, however, are clear; whatever other characteristics the candidate of minority choice may have, that candidate will face a serious obstacle to obtaining substantial anglo support if he or she is black or Mexican-American. In short, we do not doubt that the system will allow "a bloc voting majority over a substantial period of time consistently to defeat minority candidates . . . ." H.R.Rep. No. 227 at 30.

Unquestionably, many characteristics of the Lubbock electoral system do not disproportionately disadvantage minorities. Despite the relative political powerlessness of blacks and Mexican-Americans, Lubbock City officials have not been especially heedless of minority needs and input. The City's justification for the system does not, on this record, so lack support that one could conclude that it is mere pretext. Except to the extent that political realities may render the effort pointless, Lubbock's blacks and Mexican-Americans may register and vote freely.

▮▮▮▮▮. We acknowledge that this at-large system does not become unlawful merely because it disadvantages a discrete and insular minority. *Rogers v. Lodge,* 458 U.S. at 616–17, 102 S.Ct. at 3275–76. *Bolden,* 446 U.S. at 66, 100 S.Ct. at 1499; *White v. Regester,* 412 U.S. at 765, 93 S.Ct. at 2339. Even where an at-large system interacts with a racially or ethnically polarized electorate to the disadvantage of the minority, the "result" is not necessarily a denial of political access. *Whitcomb v. Chavis,* 403 U.S. at 156–60, 91 S.Ct. at 1875–77. Section 2 of the Voting Rights Act requires that we give effect to two commands. On one hand, we cannot uphold the Lubbock election scheme if it inflicts a discriminatory result so severe that the plaintiffs have lost equal access to the political process. On the other hand, the factors demonstrating a discriminatory result must amount to more than mere judicial enforcement of proportional representation. If

Congress seriously intended to disavow proportional representation and to codify any of the spirit of prior case law, the district court must have evaluated the totality of circumstances under section 2 so as meaningfully to distinguish the "result" in *Whitcomb*—that polarized voting does not render an at-large system dilutive of minority voting strength.

While Congress relied heavily on *Zimmer* in articulating the statutory test, two subtle changes in emphasis bear mention. First, Congress not only failed to follow *Zimmer's* distinction between primary and enhancing factors, but also relegated two primary factors—unresponsiveness and tenuousness—to secondary importance. Second, Congress has articulated as an objective factor an evidentiary issue—polarized voting—that this court's pre-*Bolden* cases had not treated as a matter of primary importance.

The congressional rejection of the primary-enhancing distinction requires that we alter slightly the approach taken by our early cases. After *Zimmer,* this court frequently struggled to define which factors a plaintiff must prove to establish voting dilution. Adhering to the *Zimmer* distinction between primary and enhancing factors, some cases suggested that a plaintiff must demonstrate at least one primary factor. *Zimmer,* 485 F.2d at 1305; *accord David v. Garrison,* 553 F.2d 923, 928 (5th Cir.1977). Other cases suggested that a showing of one primary factor alone provided no basis to render an electoral system invalid. *Hendrix v. Joseph,* 559 F.2d at 1270; *McGill v. Gadsden County Commission,* 535 F.2d 277, 280–81 (5th Cir.1976).

Rather than emphasizing any particular factors, Congress has now directed the courts to apply the objective factor test flexibly. The legislative history specifies that the list of factors does not purport to encompass all the indicia of an electoral system that discriminates. The factors merely focus the inquiry whether the electoral system, in light of its present effects and historical context, treats minorities so unfairly that they effectively lose access to

the political processes. As the Senate Report noted:

> The courts ordinarily have not used these factors, nor does the Committee intend them to be used, as a mechanical "point-counting" device. The failure of the plaintiffs to establish any particular factor is not rebuttable evidence of non-dilution. Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, "minimized or cancelled out."

S.Rep. No. 417 at 29 n. 118, 1982 U.S.Code Cong. & Ad.News at 207 n. 118. The legislative history posits that the objective factors will distinguish an unlawful electoral system in which considerations of race and ethnicity pervade politics to the serious detriment of the minority, from a permissible electoral system in which the racial and ethnic composition of the elected body does not mirror that of the constituency.

■ The legislative discussion of polarized voting requires that we weigh more carefully the effect that polarization has on the political scheme challenged. While this court has often regarded polarized voting as a prerequisite to a voting dilution claim, Congress, and, indeed, the most recent Supreme Court case, suggest that polarization carries greater significance. In *Wallace v. House,* 515 F.2d 619 (5th Cir.1975), *vacated,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), this court first recognized that a pattern of bloc voting could aggravate the effects of enhancing factors such as majority vote rules and anti-single shot voting provisions; in combination they effectively minimized minority political impact. *Id.* at 624. This court en banc reiterated that observation. In *Kirksey v. Board of Supervisors,* 554 F.2d at 149, the court noted that

a pattern of bloc voting could endow a plan with a "predictable tendency"—to dilute black voting strength. *Id.* at 149. Nevertheless, this court did not regard bloc voting as the equivalent of a primary factor under *Zimmer.* As the court noted in *Nevett v. Sides,* 533 F.2d 1361, 1365 (5th Cir.1976), bloc voting does not unconstitutionally dilute voting strength without reference to the other *Zimmer* factors. *Id.*[17]

■ In light of the legislative formulation of the "results" test, we believe that the district court did not err in finding that the aggregate of the factors, in the circumstances of this case, inflicted a substantially more severe result on Lubbock's minorities than the one in *Whitcomb.* Lubbock's electoral system incorporates every feature that courts have identified as aggravating the impact of an at-large system. Indirectly, these features "inescapably" act as formal obstacles to effective minority participation. *See Washington v. Finlay,* 664 F.2d 913, 920 (4th Cir.1981), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982). In sufficient combination, as exist here, these impediments "can operate directly to 'submerge' the minority in a racially polarized constituency; to 'minimize or cancel out its voting potential;' to affect adversely its 'political strength.'" *Id.*

In addition, the district court found a continuity in effects between the history of discrimination in Lubbock and the present levels of minority participation. Although the court believed that voter registration drives—none of them City sponsored—have, to an extent, ameliorated these effects, the present political system nevertheless preserves a past lack of access. In *Nevett II,* this court noted:

> A remotely enacted plan ... that was adopted without racial motivations may become a vehicle for the exclusion of meaningful input because intervening

---

17. Polarized voting is not itself unconstitutional, and does not *ipso facto* render the electoral framework in which it occurs unconstitutional. *United Jewish Organizations v. Carey,* 430 U.S. 144, 165–67 & n. 24, 97 S.Ct. 996, 1009–10 & n. 24, 51 L.Ed.2d 229 (1977) (plurality opinion of White, J.); *Whitcomb v. Chavis,* 403 U.S. 124, 153–60, 91 S.Ct. 1858, 1873–77, 29 L.Ed.2d 363 (1971). This court has regarded polarized voting as a precondition of a voting dilution claim, *Nevett II,* 571 F.2d at 223 n. 16, but not as persuasive evidence of the existence of dilution.

events cause the plan to work that way. When the more blatant obstacles to black access are struck down, such an at-large plan may operate to devalue black participation so as to ignore black needs.

571 F.2d at 222. Although *Nevett II* required that the system be maintained for invidious reasons, section 2 has excised that requirement.

On the strength of these factors, we find sufficient support to uphold the district court's ultimate finding. Perceiving no error, we affirm the judgment insofar as it holds Lubbock's electoral system violative of section 2 of the Voting Rights Act.

### E. Remedy.

Finally, we consider the City's challenge to the court-ordered districting plan. The City raises a single narrow challenge to the remedial order. In drawing six single-member districts, the court allegedly over-represented Lubbock's minority communities. As the City sees the matter, the large minority populations in two of those districts ensure that a mere 26.1% of the population will control 33.3% of the council seats.

■ A district judge adopting districting plans to replace an invalidated at-large system must adhere to a middle road. While a court must avoid drafting a plan as a device for installing proportional representation, *Marshall v. Edwards,* 582 F.2d 927, 934–36 (5th Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), so also, the court cannot blind itself to the effect of its districting plan on racial groups. *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151 (5th Cir.1981). We believe that, at least insofar as the City complains of racial fairness, the court remained well within its discretion.

First, we observe that the City presumes too much in its statement of the argument. As drawn, no racial or ethnic group, other than anglos, has even a population majority in any of the six Lubbock districts. Far from creating a "safe" minority district, the two districts with the largest minority concentrations have the following populations: District 1 has 41.4% anglo, 7.2% black, 48.5%

Mexican-American and 2.9% "other," and District 2 has 25.6% anglo, 36.1% black, 36.6% Mexican-American and 1.6% "other." Obviously, no racial or ethnic group could dominate elections without either depending on a coalition with another racial or ethnic group, or depending on substantial cross-over voting from other racial and ethnic groups.

Nor does evidence suggest that these population figures reflect adequately the relative political strength of each racial and ethnic group. As the City points out in its brief, the minority population has a smaller percentage of voting age population than anglos. In addition, Mexican-Americans have substantially lower registration rates than anglos. When the ethnic composition of the districts and the characteristics of the minority populations are taken into account, the City's proposition about "minority control" of the districts becomes sheer hyperbole.

In addition, we would hardly regard the districts in the court's plan as an attempt to build ideal minority districts. The court was obliged to take notice that the Lubbock black and hispanic populations live, for the most part, in concentrated neighborhoods. That settlement pattern compelled the district court to abstain from drawing lines that might fragment either minority community so as to dilute its voting strength. *Kirksey v. Board of Supervisors,* 554 F.2d at 143. To bring the minority community closer to the City's ideal scenario, the court would have had to pack the entire minority population into a single district. Such an attempt to stack the minority community might have engendered a similar challenge for voting dilution. Given Lubbock's geographic and demographic layout, we find no abuse in the court's line-drawing as it affects white voting strength.

At the same time, we note shortcomings in the proceedings below that have not been made the subject of this appeal. The present remedial order was entered on March 4, 1983—less than a month and a half following judgment on the merits. The court

first solicited comment on court-drawn plans on the day of final judgment on the merits. Although the district court conducted oral argument, it conducted no evidentiary hearing.

While it may be clear to us that the district court—with at least the acquiescence, if not the connivance, of the parties—believed that the proceedings merited expedited treatment, the procedures, if challenged, would have required that we vacate this order. For the sake of future courts, we reiterate briefly some of the principles that the district court should bear in mind. Apportionment is principally a legislative responsibility. *E.g., Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). A district court should, accordingly, afford to the government body a reasonable opportunity to produce a constitutionally permissible plan. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). If the governmental body does submit a plan, the court should, before rejecting it, determine that the substitute plan itself is unlawful. *Id.* For us to pass on the propriety of the district court's action, we must have either specific fact findings or, at least, a record sufficient to allow review. Without hearings, and without findings addressed to the government body's plan, we would not be in a position to determine whether the district court properly exercised its discretion in rejecting the City's plan.

Fortunately, in this case, the sole challenge by appellant focuses on the racial fairness of the court's plan, and the record in this case is adequate to review the plan's fairness. *Cf. Wyche v. Madison Parish Police Jury,* 635 F.2d at 1162.

The judgment is REVERSED insofar as it finds the City's at-large system violative of the fifteenth amendment. In all other respects, the judgment is AFFIRMED. Appellant will bear the costs.